# In the United States Court of Federal Claims

No. 14-1202

Filed: August 29, 2018

*******************************************

RMA ENGINEERING S.A.R.L., d/b/a/
RMV ARCHITECTS,

      Plaintiff,

v.

THE UNITED STATES,

      Defendant.

*******************************************

| |
|---|
| Breach of Contract; |
| Constructive Change; |
| Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (2006); |
| Duty of Good Faith and Fair Dealing; |
| Federal Acquisition Regulation, 48 C.F.R. §§ 6.101 (Competition Requirements), 16.202-1 (Firm, Fixed-Price Contract), 49.103 (Methods of Settlement), 52.221-13 (Change Order Extensions), 52.233-1 (Disputes), 52.236-2 (Differing Site Conditions), 52.236-3 (Site Investigations and Conditions Affecting Work), 52.236-13 (Safety Equipment), 52.242-14 (Excusable Delays), 52.243-7 (Change Order), 52.246-12 (Inspection of Construction), 52.249-2 (Termination For Convenience), 52.249-10 (Termination For Default), 53.301-1436 (Settlement Proposal (Total Cost Basis)); |
| Ratification; |
| Rules of the United States Court of Federal Claims 9(k) (Pleading Requirements for Contract Claims), 11(b)(3) (Representations to the Court), 12(b)(1) (Subject Matter Jurisdiction), 12(b)(6) (Failure to State a Claim), 15 (Amending Pleadings); |
| Safety and Health Regulations for Construction, 29 C.F.R. §§ 1926.1–1926.1442; |
| Tucker Act Jurisdiction, 28 U.S.C. § 1491. |

**John M. Manfredonia**, Manfredonia Law Offices, LLC, Creskill, New Jersey, Counsel for Plaintiff.

**Sean Siekkinen**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND ORDER

**BRADEN**, *Senior Judge*.

On November 9, 2017, the Government filed a Motion To Dismiss a Second Amended Complaint filed by RMA Engineering S.A.R.L d/b/a RMV Architects ("RMA") that alleged twenty-three counts arising from the United States Army's ("Army") August 4, 2010 decision to terminate an August 1, 2009 contract awarded to RMA for default. In response, RMA filed a March 22, 2018 Cross-Motion, requesting that the court grant RMA leave to file a Third Amended Complaint. For the reasons discussed herein, the Government's Motion To Dismiss is granted as

to Counts 1 through 9 and 11 through 23, but denied as to Count 10. RMA's Cross-Motion For Leave To Amend is denied.

To facilitate review of this Memorandum Opinion And Order, the court has provided the following outline:

I.     FACTUAL BACKGROUND.
       A.     On August 1, 2009, The United States Army Awarded Contract No. W90BRJ-09-C-0036 To RMA Engineering S.A.R.L.
       B.     On August 1, 2009, RMA Engineering S.A.R.L. Received A Notice To Proceed.
       C.     On August 4, 2010, The United States Army Terminated The August 1, 2009 Contract For Default.

II.    PROCEDURAL HISTORY.

III.   DISCUSSION.
       A.     Jurisdiction.
       B.     Standing.
       C.     The Government's November 9, 2017 Motion To Dismiss, Pursuant to RCFC 12(b)(1).
              1.     The Government's Argument.
              2.     RMA Engineering S.A.R.L.'s Response.
              3.     The Government's Reply.
              4.     The Court's Resolution.
                     a.     Standard Of Review For A Motion To Dismiss, Pursuant To RCFC 12(b)(1).
                     b.     RMA Engineering S.A.R.L.'s Claim For Wrongful Termination (Count 1).
                     c.     RMA Engineering S.A.R.L.'s Claims For Delay, Post-Termination Costs, Breach of Contract, And Breach Of The Duty Of Good Faith And Fair Dealing (Counts 2, 21, 22, and 23).
       D.     The Government's November 9, 2017 Motion To Dismiss, Pursuant To RCFC 12(b)(6).
              1.     The Government's Argument.
              2.     RMA Engineering S.A.R.L.'s Response.
              3.     The Government's Reply.
              4.     The Court's Resolution
                     a.     Standard Of Review For A Motion To Dismiss, Pursuant To RCFC 12(b)(6).
                     b.     Differing Site Conditions (Counts 3 and 10).
                     c.     Constructive Changes (Counts 4–9, 11–14, and 17–20).
                     d.     Misrepresentation Or Unjust Enrichment (Counts 15 and 16).
                     e.     Post-Termination Costs (Count 21).
       E.     RMA Engineering S.A.R.L.'s March 22, 2018 Cross-Motion For Leave To File A Third Amended Complaint.
              1.     RMA Engineering S.A.R.L.'s Argument.
              2.     The Government's Response.

3.    RMA Engineering S.A.R.L.'s Reply.
4.    The Court's Resolution.
    a.    Governing Precedent.
    b.    Whether The Third Amended Complaint Is Unduly Delayed Or
        Prejudicial To The Government.
    c.    Whether The Third Amended Complaint Is Futile.
        i.    Differing Site Conditions (Counts 3 and 10).
        ii.   Constructive Change (Counts 4–9, 11–14, and 17–20).
        iii.  Uncompensated Pre-Award Design Work (Counts 15–16).

IV.    CONCLUSION.

# I.    FACTUAL BACKGROUND.[1]

## A.    On August 1, 2009, The United States Army Awarded Contract No. W90BRJ-09-C-0036 To RMA Engineering S.A.R.L.

On August 1, 2009, the Army awarded Contract No. W90BRJ-09-C-0036 (the "Contract") to RMA to build training facilities at the Saudi Arabian National Guard (the "SANG") base in Khashm Al An, Riyadh, Saudi Arabia (the "Project"). Gov't App'x at 1–2. The Contract was a Foreign Military Sales procurement, whereby RMA agreed to design and build a two-story administrative building, one warehouse, and three sunshades for outdoor training for the 43rd Mechanized Infantry Battalion. 2d Am. Compl. ¶¶ 1, 2, 12. The Contract provided that the administrative building and warehouse would be original designs, but the covered training shelter would be a "modified and site adapted design." Gov't App'x at 9–10.

A Joint Engineering Team ("JET") was designated with "cognizance over all technical aspects of the [C]ontract and . . . [responsibility] for monitoring [c]ontractor performance." Gov't App'x at 27. The JET included personnel from the SANG and the Army, including the Contracting Officer's Representative ("COR"). 2d Am. Compl. ¶ 2. The JET was responsible for reviewing three phases of proposed designs, *i.e.*, the S-1, S-2, and S-3. Gov't App'x at 11.

The Contract required RMA to submit the S-1 design to the JET and, "[u]pon receipt of JET S-1 comments, [RMA was to] incorporate all comments in the drawings and documents, concurrently with the preparation of S-2[ design]." Gov't App'x at 11. Thereafter, RMA was required to submit the S-2 design to the JET for additional comments and approval. Gov't App'x at 11. Then, RMA was required to incorporate any JET comments on the S-2 design into the S-3 design, *i.e.*, the final design. Gov't App'x at 11. RMA was required to build each of the structures according to the S-3 design and, on completion, the buildings were to be "complete and usable in all respects[.]" Gov't App'x at 12.

---

[1] The facts discussed herein were derived from the September 6, 2017 Second Amended Complaint ("2d Am. Compl.") and Appendix, filed with the Government's November 9, 2017 Motion To Dismiss ("Gov't App'x").

The Contract provided that RMA agreed to supply "all materials, equipment, labor, supervision, and resources required to design and construct" for a firm, fixed-price[2] of 4,370,771 Saudi Riyals, of which 352,500 Saudi Riyals would be paid for the S-1, S-2, and S-3 designs. Gov't App'x at 7–9.

On August 1, 2009, the Army issued a Notice To Proceed that required RMA to complete all work within 180 days, *i.e.*, by February 6, 2010.  2d Am. Compl. ¶ 14; Gov't App'x at 21. Mobilization was to begin after the S-1 design was approved by the JET; full payment would be made "in accordance with Contract Paragraph G.7" and under the relevant CLINs.  Gov't App'x at 12.

RMA was required to construct all required buildings, in "accordance with the technical specifications, contract drawings, approved site adapt drawings, and contract requirements." Gov't App'x at 15.  "[C]hanges in or deviation from the scope of work" could be made, but could be authorized only by the Contracting Officer ("CO"), by a contract modification.  Gov't App'x at 27.[3]  Because the Contract was a Foreign Military Sales procurement, the following clause was included:

> All communication by the [c]ontractor with all officials, representatives, and/or offices of the Saudi Arabian Government in all matters pertaining to the design or construction of this contract, shall be through and in full liaison with the [CO].  This does not relinquish [c]ontractor responsibility for obtaining routine items to conduct day-to-day business, such as visas, permits, and custom clearances.

Gov't App'x at 37.

Importantly, RMA was required to

> perform [a] Geotechnical Investigation in order to establish soil bearing capacity and other soil characteristics at the site. . . . The [c]ontractor shall prepare a Geotechnical [R]eport, prepare a site topographic plan, prepare a site plan for facilities (existing and new), prepare a site adapt analysis, and prepare site adapt drawings for construction of the facilities included in this total [P]roject.

Gov't App'x at 12–13.

---

[2] A "firm, fixed[-]price contract" is one that "provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract," placing maximum risk on the contractor along with "full responsibility for all costs and resulting profit or loss."  48 C.F.R. § 16.202-1.

[3] The COR was authorized "to act on behalf of the [CO]."  Gov't App'x at 27.  The COR, however, was not "authorized to make any commitments or changes that [would] affect price, quality, quantity, delivery, or any other term or condition of the contract."  Gov't App'x at 27.  In addition, the Contract provided that the "presence or absence of a Government inspector does not relieve [RMA] from any contract requirement, nor is the inspector authorized to change any term or condition of the specification without the [CO's] written authorization."  Gov't App'x at 18.

The Geotechnical Investigation and Report were to be used by RMA to "design [the] building foundation and other design works . . . consistent with [the] site specific geotechnical condition."  Gov't App'x at 128.  Failure "to take the action described and acknowledged in this paragraph [would] not relieve [RMA] from responsibility for estimating properly the difficulty and cost of successfully performing the work."  Gov't App'x at 128.

The Contract also incorporated FAR 52.236-3[4] concerning Site Investigation and Conditions Affecting the Work.  Gov't App'x at 84.

---

[4] FAR 52.236-3 provides,

(a) The [c]ontractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to . . . (4) conformations and conditions of the ground. . . .  The [c]ontractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from the drawings and specifications made part of this contract.  Any failure of the [c]ontractor to take the actions described and acknowledged by this paragraph will not relieve the [c]ontractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the Government.

(b) The Government assumes no responsibility for any conclusions or interpretations made by the [c]ontractor[,] based on the information made available by the Government.  Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract.

48 C.F.R. § 52.236-3.

In addition, the Contract incorporated a number of other standard Federal Acquisition Regulation ("FAR") provisions, including FAR 52.221-13,[5] FAR 52.233-1,[6] FAR 52.236-2,[7] FAR

---

[5] This clause provided that any change order granting a time extension may "provide that the contract completion date will be extended only for those specific elements related to the changed work and that the remaining contract completion dates for all other work will not be altered."  Gov't App'x at 21–22.

[6] This clause provided that the Contract was subject to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (recodified as amended at 41 U.S.C. §§ 7101–7109) (hereinafter "CDA"), and "all disputes arising under or relating to" the Contract were to be resolved in accordance with that clause.  Gov't App'x at 80.  That clause defined a "claim" and set forth the procedures for submitting a claim to the CO, and provided that the "[CO]'s decision shall be final unless the [c]ontractor appeals or files a suit as provided in the [CDA]."  Gov't App'x at 81.

[7] This clause provided, in relevant part, that

(a) The [c]ontractor shall promptly, and before the conditions are disturbed, give a written notice to the [CO] of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The [CO] shall investigate the site conditions promptly after receiving the notice.  If the conditions do materially so differ and cause an increase or decrease in the [c]ontractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

*          *          *

(d) No request by the [c]ontractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

Gov't App'x at 83–84.

52.236-13,[8] FAR 52.242-14,[9] FAR 52.243-7,[10] FAR 52-246-12,[11] FAR 52.249-2,[12] and FAR 52.249-10.[13]

---

[8] This clause provided that the contractor must "[p]rovide appropriate safety barricades, signs, and signal lights; . . . [c]omply with the standards issued by the Secretary of Labor at 29 [C.F.R.] part 1926 and 29 [C.F.R.] part 1910; . . . and [e]nsure that any additional measures the [CO] determines to be reasonably necessary for the purposes are taken."  Gov't App'x at 88.

[9] This clause provided, in relevant part, that

(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the [CO] in the administration of this contract, or (2) by the [CO]'s failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made of an increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the [c]ontractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

(c) A claim under this clause shall not be allowed (1) for any costs incurred more than 20 days before the [c]ontractor shall have notified the [CO] in writing of the act or failure to act involved (but this requirement shall not apply as to a claim resulting from a suspension order), and (2) unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of the suspension, delay, or interruption, but not later than the date of final payment of the contract.

Gov't App'x 22.

[10] This clause provided, in relevant part, that

(b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the [CO] that causes a change shall be treated as a change under this clause; Provided that the [c]ontractor gives the [CO] written notice stating . . . [t]he date, circumstances, and source of the order; and . . . [t]hat the [c]ontractor regards the order a change order.

Gov't App'x at 94.

---

[11] This clause provided, in relevant part, that

(f) The [c]ontractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price.

\*       \*       \*

(h) If, before acceptance of the entire work, the Government decides to examine already completed work by removing it or tearing it out, the [c]ontractor, on request, shall promptly furnish all necessary facilities, labor, and material.  If the work is found to be defective or nonconforming in any material respect due to the fault of the [c]ontractor or its subcontractors, the [c]ontractor shall defray the expenses of the examination and of satisfactory reconstruction.  However, if the work is found to meet contract requirements, the [CO] shall make an equitable adjustment for the additional services involved in the examination and reconstruction, including, if completion of the work was thereby delayed, an extension of time.

Gov't App'x at 18–19.

[12] This clause provided, in relevant part, that

(a) The Government may terminate performance of work under this [C]ontract in whole or, from time to time, in part if the [CO] determines that a termination is in the Government's interest.  The [CO] shall terminate by delivering to the [c]ontractor a Notice of Termination specifying the extent of termination and the effective date.

(b) After receipt of a Notice of Termination, and except as directed by the [CO], the [c]ontractor shall immediately proceed with the following obligations, regardless of any delay in determining or adjusting any amounts due under this clause:

(1) Stop work as specified in the notice.

(2) Place no further subcontracts or orders (referred to as subcontracts in this clause) for materials, services, or facilities, as except as necessary to complete the continued portion of the [C]ontract.

(4) Assign to the Government, as directed by the [CO], all right, title, and interest of the [c]ontractor under the subcontracts terminated, in which case the Government shall have the right to settle or to pay any termination settlement proposal arising out of those terminations.

RMA also was required to verify the "[l]ocations of nearest acceptable utility tie-ins . . . during site visits and preliminary surveys prior to offer" and was "responsible for [the] rerouting of any utilities impacted by the new construction work."  Gov't App'x at 33.  The Contract defined "utility systems" as "all exterior utilities, such as water, sewer, drainage, electricity, telephone, and other similar systems."  Gov't App'x at 13.  Likewise, the Contract required RMA to "indicate in

_____

> (5) With approval or ratification to the extent required by the [CO], settle all outstanding liabilities and termination settlement proposals arising from the termination of subcontracts; the approval or ratification will be final for the purposes of this clause.

Gov't App'x at 101–05.

[13] This clause provided, in relevant part, that

> (a) If the [c]ontractor refuses of fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extensions, or fails to complete the work within this time, the Government may, by written notice to the [c]ontractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed.

*               *               *

> (b) The [c]ontractor's right to proceed shall not be terminated nor the [c]ontractor charged with damages under this clause, if – (1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the [c]ontractor.  Examples of such causes include – (i) Acts of God or of the public enemy, (ii) Acts of the Government in either its sovereign or contractual capacity, (iii) Acts of another [c]ontractor in the performance of a contract with the Government, (iv) Fires, (v) Floods, (vi) Epidemics, (vii) Quarantine restrictions, (viii) Strikes, (ix) Freight embargoes, (x) Unusually severe weather, or (xi) Delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the [c]ontractor and the subcontractors; and (2) the [c]ontractor, within 10 days from the beginning of any delay (unless extended by the [CO]), notifies the [CO] in writing of the cases of the delay.  The [CO] shall ascertain the facts and the extent of delay.  If, in the judgment of the [CO], the findings of fact warrant such action, the time for completing the work shall be extended.  The findings of the [CO] shall be final and conclusive on the parties, but subject to appeal under the Disputes clause.

> (c) If, after termination of the [c]ontractor's right to proceed, it is determined that the [c]ontractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government.

Gov't App'x at 105–06.

design drawing submittals the method of connecting all facilities to electrical power" and that electrical power must "connect to the nearest SEC[14] facility in a manner proposed by the contractor and approved by . . . [the] JET." Gov't App'x at 15. Other provisions provided that RMA was "responsible for tie-in of all required utilities and paying of all connection and testing fees" that may be required by SEC or the Army. Gov't App'x at 33, 37.

Although the Contract required RMA to connect the buildings to electrical power, it also provided that "[e]lectrical service is not available for use under this contract, therefore all electric current required by the [c]ontractor shall be the responsibility of the [c]ontractor, furnished at its own expense." Gov't App'x at 36. As for other services, RMA was to:

- "include in the design of the Office Building a communication system that includes both telephone and data service to each work space. Telephone service is to be connected to the nearest appropriate telephone panel. Data communication shall include cable runs from individual workspaces to a central area to be connected in [the] future to a data server. Connection to a server or provision of a server will be done by others." Gov't App'x at 15.

- "provide and connect the telephone system as described in the addendum in [S]ection C." Gov't App'x at 130.

- "provide a complete data system in each site in accordance with SANG Information Center Specifications, Appendix A, Division 16, Tec Specs, Attachment 1, Section J. The data network shall be connected in accordance [with] the addendum in [S]ection C." Gov't App'x at 131.

- "locate the appropriate connection points for [water, sewage, and irrigation, and, d]uring design submittals, . . . propose the method of connection of these utilities. All necessary utilities must be connected in a manner that satisfies SANG specification[s] and provides for a complete and [usable] facility." Gov't App'x at 15.

And, within five calendar days of the Contract's award, RMA was required to provide the Army with "a complete list of personnel who [would] work on the [P]roject. Each request for [a] personnel pass [was to] include [the] worker's name, nationality, [a] copy of [the worker's] passport and igama [sic],[15] blood type, and four (4) 2 x 3 cm size photographs." Gov't App'x at 33. RMA also was to "be ready as directed by [the] SANG security to present original passport and igama [sic] for verification." Gov't App'x at 34.

---

[14] The Contract did not define "SEC," but this term appears to refer to an electricity provider.

[15] The Contract did not define "iqama." According to the Government, an iqama is a "visa." Gov't Mot. at 21.

**B.     On August 1, 2009, RMA Engineering S.A.R.L. Received A Notice To Proceed.**

On August 1, 2009, the Army issued a Notice To Proceed.  2d Am. Compl. ¶ 17.  Shortly after performance began, RMA experienced delays in accessing the Project site that prevented mobilization[16] by September 1, 2009, as required by the Contract.  2d Am. Compl. ¶¶ 17–18.  For example, the "[SANG] prevented equipment and material deliveries [from proceeding] through the security checkpoint[,]" because "trucks were turned back and forced to return several days later at a rescheduled time."  2d Am. Compl. ¶ 18.  In addition, cement trucks were denied entry to the site, so several concrete deliveries required for foundation work had to be rescheduled. 2d Am. Compl. ¶ 28.

On August 9, 2009, Riyadh Geotechnique & Foundations ("RGF") began a geotechnical investigation of the site of the Project that was completed on August 13, 2009.  2d Am. Compl. ¶ 114.  On August 19, 2009, RGF provided the results to RMA that found the "subsurface soils contained backfill materials consisting of trash, metal pieces, debris and materials, unprocessed stone fragments in excess of six (6) inches in diameter and unsafe (non-blended) backfilling and material harmful to building structures."  2d Am. Compl. ¶ 115.  RGF "recommended removal of these . . . materials and replacement with clean soil" and that the building foundation be "at least 1.5 meters at the lowest topographical elevation and 1.8 meters deep at the highest topographical elevation."  2d Am. Compl. ¶ 116.

On August 26, 2009, RMA notified the Army by letter that RMA continued to experience Project site access delays.  2d Am. Compl. ¶ 19.  On September 6, 2009, RMA began the process to obtain layout and utility clearances for excavation work.  2d Am. Compl. ¶ 23.  On September 9, 2009, RMA advised the Army and the SANG that it still was experiencing Project site access problems and the "SANG promised to communicate with the police department 'to expedite [RMA's] access to [the Project] site[.]'"  2d Am. Compl. ¶ 20.

On September 12, 2009, RMA revised plans to conform to the foundation depths recommended by RGF.  2d Am. Compl. ¶ 118.  On September 22, 2009, RMA completed mobilization.  2d Am. Compl. ¶ 21.  Thereafter, however, RMA continued to experience delays. 2d Am. Compl. ¶¶ 15, 24.  Although the Contract required RMA to submit design drawings to the JET prior to construction to facilitate the Army's review and approval within seven calendar days, neither the Army nor the SANG reviewed design submittals in a "timely manner."  2d Am. Compl. ¶ 15.

On October 3, 2009, RMA sent a letter to "Defendant" stating that it encountered a waterline that "conflicted with the location of the building's foundation, [so] it had to be

_____

[16] The Contract did not define "mobilization," but described a "Contractor's Mobilization Area" to be used "for operation of [RMA's] construction equipment and plants, shops, warehouses, and offices[;]" upon completion of construction, "all facilities [were to] be dispose[d] of in accordance with applicable Saudi Arabian Government [l]aws and [r]egulations."  Gov't App'x at 12, 35.  This area also was to be "cleared of construction debris and other materials and the area restored to its final grade."  Gov't App'x at 35.

relocated." 2d Am. Compl. ¶¶ 31–32.  This required that the main water supply be shut off, but RMA had to wait approximately one week for that to occur.  2d Am. Compl. ¶ 33.

On October 10, 2009, the JET requested that RMA redesign the first floor of the administrative building to include a pantry, instead of a store room, causing RMA to incur additional cost and delay.  2d Am. Compl. ¶¶ 65–66.

In early November 2009, RMA completed relocating the waterline.[17]  2d Am. Compl. ¶ 33.  By mid-November 2009, the JET requested that all submittals be reviewed and approved by JET engineers.  2d Am. Compl. ¶ 16.  By that time, however, RMA had experienced 45 days of delay, because over 200 submittals were not "timely approved." 2d Am. Compl. ¶¶ 15, 16.  RMA also encountered other delays.  For example, RMA "planned on" installing, and the "Defendant" approved, a 15-ton Air Handling Unit ("AHU"), although it was not readily available in Riyadh, Saudi Arabia.  2d Am. Compl. ¶ 57.  But, during construction, an unspecified individual directed RMA to install an 18-ton AHU.  2d Am. Compl. ¶ 58.  This required RMA to redo calculations for "system, electrical roof supports, piping, ductwork, and other items." 2d Am. Compl. ¶ 58.  In addition, RMA received approval for lighting fixtures listed in a supplier's catalog, but after RMA installed most of the wiring, "Defendant" requested a change to the electrical wiring for light fixtures.  2d Am. Compl. ¶ 38.

On December 14, 2009, RMA completed excavation and foundation work.  2d Am. Compl. ¶¶ 24, 119.  This, however, was 92 days later than RMA anticipated, because, in addition to Project site access delays, RMA needed to perform additional excavation, foundation work, unsuitable soil removal, and subsurface waterline relocation.  2d Am. Compl. ¶¶ 24–26.

On January 14, 2010, RMA began to remove electrical wiring from the walls and ceiling before installing new wiring and conduits.  2d Am. Compl. ¶¶ 38–39.

On January 20, 2010, RMA submitted a roofing and waterproofing system to the Army for approval that included a single layer of extremely durable synthetic rubber roofing membrane, or EPDM rubber membrane.  2d Am. Compl. ¶¶ 46–47.  On an unspecified date thereafter, RMA began to install the waterproofing system, but after that work was substantially completed, the Army requested a roofing and waterproofing system with a double-layer EPDM rubber membrane.  2d Am. Compl. ¶ 48.

On January 30, 2010, RMA was required to rework toilet plumbing, including dismantling walls and pipes, because the Army made several changes to the plumbing requirements during a site inspection.  2d Am. Compl. ¶¶ 35–36.

On or about February 3, 2018, the JET "verbally approved the light fixtures shown in a supplier catalog." 2d Am. Compl. ¶ 177.  On February 15, 2010, RMA completed the toilet plumbing changes, as well as the concrete walls, floors, and roof deck.  2d Am. Compl. ¶¶ 29, 36.

---

[17] The Second Amended Complaint alleges, in separate paragraphs, that this work was completed on November 9, 2009, and on November 11, 2009.  2d Am. Compl. ¶¶ 33, 161.

On February 23, 2010, the COR approved RMA's submitted lighting drawings. 2d Am. Compl. ¶ 42. On February 28, 2010, RMA submitted an order for the light fixtures. 2d Am. Compl. ¶ 42.

From March 2, 2010 to March 7, 2010, RMA installed the 18-ton AHU. 2d Am. Compl. ¶ 59. Beginning on March 12, 2010, RMA began replacing piping to connect the waterline of the office building's water supply to the main waterline, after the Army directed it to install a 2.5-inch waterline in lieu of the 2-inch waterline previously installed, despite RMA's insistence that doing so was "economic waste." 2d Am. Compl. ¶¶ 52–55.

On March 17, 2010, RMA completed the additional electrical wiring replacement. 2d Am. Compl. ¶ 40. Two days later, RMA completed the office building waterline replacement. 2d Am. Compl. ¶ 55.

On March 31, 2010, RMA submitted a double-layer EPDM rubber membrane roofing and waterproofing system for approval. 2d Am. Compl. ¶ 49.

During a site inspection on April 1, 2010, "the Government" approved the double-layer EPDM rubber membrane roofing and waterproofing system. 2d Am. Compl. ¶ 49.

Between April 1, 2010 and April 3, 2010, light fixtures were delivered to the Project site. 2d Am. Compl. ¶¶ 42, 177. Thereafter, RMA installed some of the fixtures. 2d Am. Compl. ¶ 44. During a subsequent site visit, however, a JET inspector rejected the light fixtures, requiring RMA to "restart[] the lighting approval process." 2d Am. Compl. ¶¶ 43, 178.

From April 3, 2010 to April 8, 2010, RMA installed the double-layer EPDM rubber membrane roofing and waterproofing system, causing a six-day delay. 2d Am. Compl. ¶¶ 46, 50.

On an unspecified date, "Defendant" directed RMA to install telephone and data wiring and a main circuit breaker at a transformer on the Project site, causing RMA to incur additional delay and cost. 2d Am. Compl. ¶¶ 61–64.

In addition, throughout construction, JET engineers imposed "stringent safety measures," including safety handrails, temporary stairs, and wood platforms that required RMA to incur delay and cost. 2d Am. Compl. ¶¶ 68–69.

C.    **On August 4, 2010, The United States Army Terminated The August 1, 2009 Contract For Default.**

On May 10, 2010, RMA submitted a Request for Equitable Adjustment ("REA") to the CO in the amount of $174,634, for "compensation for additional foundation works and relocation of water main not included in the original contract scope for this [P]roject." Gov't App'x at 146. The REA requested "a fair and final decision on this subject by the [CO] on our behalf" and represented that "supporting documents" were attached "by way of evidence that work executed justifies the calculated amounts." Gov't App'x at 146.

On June 20, 2010, the Army issued a Cure Notice informing RMA that it intended to terminate the Contract, if the administrative building and warehouse were not substantially

completed by June 30, 2010 and July 20, 2010, respectively.  2d Am. Compl. ¶ 72.  At the time, the Project was in the "punch list stage."  2d Am. Compl. ¶¶ 73, 78.

On June 26, 2010, the CO issued Modification P00002 (the "Modification") extending the completion date for: (1) the administrative building, by 153 days, or until June 30, 2010; and (2) the warehouse building, by 173 days, or until July 20, 2010.  2d Am. Compl. ¶ 71.  The Modification cited FAR 52.249-10, "Default (Fixed-Price Construction)," and contained the following release provision:

> In consideration for the modification agreed to herein as complete and equitable adjustment for the above change, the contractor hereby releases the Government from any and all liability under this contract from further equitable adjustments attributable to such facts or circumstances giv[ing] rise to the change incorporated herein.

Gov't App'x at 143.

Around June 28, 2010, after several meetings between the JET and RMA's lighting supplier, the Army approved new light fixtures.  2d Am. Compl. ¶ 43.  On June 30, 2010, *i.e.*, the new completion date, the administrative building was substantially completed.  2d Am. Compl. ¶ 74.  With the Army's approval, however, RMA continued to work on the administration building after June 30, 2010.  2d Am. Compl. ¶ 76.

On July 4, 2010, RMA completed installation of the new light fixtures.  2d Am. Compl. ¶ 44.  On July 20, 2010, the warehouse was substantially completed. 2d Am. Compl. ¶ 75.  With the Army's approval, RMA continued to work on the warehouse after July 20, 2010.  2d Am. Compl. ¶ 77.  As of July 31, 2010, the Project was 88.56% complete. 2d Am. Compl. ¶ 79. Sometime in July 2010, however, RMA submitted a Request for Equitable Adjustment ("REA"). 2d Am. Compl. ¶ 86.

On August 1, 2010, RMA met with General Saud of the SANG, who stated that he intended to request the CO to terminate the Contract for default, even though RMA explained the reasons for the delay and emphasized that the buildings were substantially completed.  2d Am. Compl. ¶ 80.

On August 4, 2010, *i.e.*, nine days after the CO issued the Modification, the Army terminated the Contract for default.  2d Am. Compl. ¶ 81.  On that same day, RMA requested that the Army change the termination to a termination for convenience (the "Convenience Request") and requested compensation for preliminary design work, undisclosed surface and subsurface conditions, and other delays.  2d Am. Compl. ¶ 82.

On September 4, 2010, RMA sent a second REA to the CO again requesting that the CO change the termination to one for convenience and that RMA "be reimbursed via an equitable adjustment to the [C]ontract[.]"  Gov't App'x at 147.  That REA cited "undisclosed material conditions at the construction site, unknown physical conditions of an unusual nature, numerous changes to the contract, untoward delays, to include frequent denials of access to the work site, and unlawful acts of non-authorized personnel all of which have inequitably caused [RMA] to suffer additional costs in the amount of . . . [$1,742,571.91]."  Gov't App'x at 148.  The September

4, 2010 REA added that RMA had "substantial material in support of its claim, to include daily logs of work progress and site conditions, correspondence by and between [RMA] and Government officials[,] and records of unlawful actions by unauthorized personnel, all of which shall be made available to the [CO] and government auditors in accordance with applicable regulations at the Government's request."  Gov't App'x at 148.  The REA included the following certification:

> I, Jean Yves Rousseau, on behalf of the contractor, RMV Architects, certify that this claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Gov't App'x at 148.

Over seven months later, on April 18, 2011, the Army responded and asked for a "cost proposal/cost break-out" of the new total compensation amount.  2d Am. Compl. ¶ 83.  On June 26, 2011, RMA provided the Army with a "Construction Cost Analysis & Pay Estimate Summary" and a Critical Path Method graph.  2d Am. Compl. ¶ 84.

On July 4, 2011, RMA submitted a third REA supplementing the June 26, 2011 submission with a "Statement of Costs" that detailed RMA's claimed damages.  2d Am. Compl. ¶ 85; Gov't App'x at 149–52.

On October 26, 2011, RMA requested that the Army issue a final decision.  2d Am. Compl. ¶ 86.  On December 30, 2011, RMA again requested that the Army issue a final decision. 2d Am. Compl. ¶ 87.

On January 7, 2012, the Army requested that the Defense Contract Audit Agency conduct a contract closeout audit of the Contract.  2d Am. Compl. ¶ 88.

On January 30, 2012, RMA submitted a fourth REA that revised RMA's claimed damages. 2d Am. Compl. ¶ 89.  Thereafter, on July 23, 2012, August 1, 2012, October 1, 2012, and December 17, 2012, RMA sent letters requesting that the Army either settle RMA's claim or issue a final decision.  2d Am. Compl. ¶ 89.

On January 23, 2013, the Army advised RMA to submit a Standard Form 1436, Settlement Proposal Total Cost Basis, used to calculate costs for a termination for convenience. 2d Am. Compl.  ¶ 90.  On March 31, 2013, RMA provided a completed Standard Form 1436 to the Army. 2d Am. Compl. ¶ 91.  On June 22, 2013, July 7, 2013, August 19, 2013, and September 15, 2013, RMA continued to request that the Army settle RMA's claim or issue a final decision.  2d Am. Compl. ¶ 91.

On December 15, 2013, the CO denied all of RMA's CDA claims, including a request to convert the termination for default to a termination for convenience, as well as prior requests for compensation for: pre-award design work performed at the Army's request; additional foundation

and backfilling work, due to different site conditions; relocating a subsurface waterline; and other delays.  2d Am. Compl. ¶¶ 92–93.

## II.   PROCEDURAL HISTORY.

On December 15, 2014, RMA filed a Complaint in the United States Court of Federal Claims.  ECF No. 1.  On April 14, 2015, the Government filed an Answer.  ECF No. 8.  On June 5, 2015, the parties filed a Joint Preliminary Status Report.  ECF No. 10.  On that same day, the court issued a Discovery Scheduling Order.  ECF No. 11.

On August 14, 2015, the Government filed an Amended Answer to the December 15, 2014 Complaint.  On January 4, 2016, the court convened a telephone status conference.  ECF No. 16.

On February 18, 2016, RMA filed an Amended Complaint.  ECF No. 17.  On March 1, 2016, the court convened another telephone status conference.   On March 30, 2016, the Government filed an Answer to the February 18, 2016 Amended Complaint.  ECF No. 19.  On June 10, 2016, the parties filed a Joint Motion To Amend the court's June 5, 2015 Discovery Scheduling Order (ECF No. 20), that the court granted on June 13, 2016 (ECF No. 21).

On August 31, 2016, RMA filed a Consent Motion To Substitute Counsel (ECF No. 22) that the court granted that same day.

On December 8, 2016, the parties filed a Second Motion To Amend the court's June 5, 2015 Discovery Scheduling Order (ECF No. 23), that the court granted on December 12, 2016 (ECF No. 24).

On January 22, 2017, RMA's counsel filed a Motion To Withdraw As Attorney.  ECF No. 25.  On January 26, 2017, the Government filed a Response.  ECF No. 26.  On January 30, 2017, the court issued a Memorandum Opinion And Order requiring RMA's counsel to show cause. ECF No. 27.  On January 31, 2017, RMA's counsel filed a Response to the January 30, 2017 Memorandum Opinion And Order.  ECF No. 29.  On February 3, 2017, the court issued an Opinion that granted RMA's counsel's Motion To Withdraw.  *See RMA Engineering S.A.R.L. v. United States*, 130 Fed. Cl. 544 (Fed. Cl. 2017).

On March 2, 2017, RMA filed a Consent Motion To Substitute Counsel.  ECF No. 32.  On June 5, 2017, RMA's new counsel informed the court that RMA intended to file a Second Amended Complaint within 45 days.  ECF No. 33.  On July 17, 2017, RMA's counsel informed the court that a Second Amended Complaint would be filed no later than August 30, 2017.  ECF No. 33.

On August 31, 2017, the court issued an Order directing RMA to show cause why the case should not be dismissed, because a Second Amended Complaint was not filed nor was a motion filed to amend the December 12, 2016 Discovery Scheduling Order.  ECF No. 33.  On that same day, RMA filed a Second Motion To Amend Pleadings (ECF No. 34), that the court granted on September 5, 2017 (ECF No. 36).

On September 6, 2017, RMA filed a Second Amended Complaint. ECF No. 37. On September 14, 2017, RMA filed a Response to the court's August 31, 2017 Show Cause Order. ECF No. 39.

On November 9, 2017, the Government filed a Motion To Dismiss RMA's Second Amended Complaint, pursuant to Rules of the United States Court of Federal Claims ("RCFC") 12(b)(1) and 12(b)(6). ECF No. 42.

On January 8, 2018, RMA filed a Response to the Government's November 9, 2017 Motion To Dismiss, together with a Cross-Motion For Leave To File A Third Amended Complaint. ECF No. 45. That Response, however, inadvertently included privileged materials, so on February 23, 2018, the parties filed a Joint Motion To Amend/Correct the Response And Cross-Motion, together with a Joint Motion For Extension Of Time to respond and reply to the corrected filing. ECF No. 49. On that same day, the court granted both Joint Motions. ECF No. 50.

On March 22, 2018, RMA filed a corrected Response And Cross-Motion For Leave To File A Third Amended Complaint. ECF No. 51. On April 23, 2018, the Government filed a Reply And Response to RMA's January 8, 2018 Response And Cross-Motion. ECF No. 52. On April 30, 2018, RMA filed a Reply. ECF No. 53. On that same day, the Government filed a Notice that included new information regarding the prejudice argument raised in the April 23, 2018 Reply And Response. ECF No. 54.

## III.   DISCUSSION.

### A.   Jurisdiction.

The United States Court of Federal Claims has jurisdiction, under the Tucker Act, to adjudicate any claim that arises under the CDA, 41 U.S.C. §§ 601–613,[18] and has been submitted to a CO for a final decision. *See* 28 U.S.C. § 1491(a)(2) ("The [United States] Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section [609(a)(1)] of title 41 . . . on which a decision of the [CO] has been issued[.]"); *see also* 41 U.S.C. § 609(a)(1) ("[I]n lieu of appealing the decision of a [CO] . . . to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims[.]").

---

[18] The Contract's Disputes Clause incorporates the 2006 version of the CDA, that is codified at 41 U.S.C. §§ 601–613 (2006). Gov't App'x at 80. Accordingly, the court refers to that codification.

A claim "arises under" the CDA, if it is based on

> any express or implied contract . . . made by an executive agency for— (1) the procurement of services, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair, or maintenance of real property; or (4) the disposal of personal property.

41 U.S.C. § 602(a).

A "claim" is defined as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract." 48 C.F.R. § 52.233–1.  Although a CDA claim need not be submitted in any particular form or use any particular wording, it must contain "a clear and unequivocal statement that gives the [CO] adequate notice of the basis and amount of the claim."  *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987).  The CDA also requires that the claim indicate to the CO that the contractor is requesting a "final" decision.  *See James M. Ellet Constr. Co. v. United States*, 93 F.3d 1537, 1543 (Fed. Cir. 1996).

The September 6, 2017 Second Amended Complaint includes twenty-three CDA counts arising from the Army's August 4, 2010 decision to terminate an August 1, 2009 contract awarded to RMA for default: Count 1 alleges wrongful termination; Count 2 alleges excusable and compensable delays; Counts 3 and 10 allege differing site conditions; Counts 4 through 9, 11 through 14, and 17 through 20 allege constructive changes to the Contract; Counts 15 and 16 allege pre-award misrepresentations that caused uncompensated work and cost overruns; Count 21 alleges uncompensated post-termination work; Count 22 alleges a breach of contract; and Count 23 alleges a breach of the implied duty of good faith and fair dealing.  2d Am. Compl. ¶¶ 94–227.  The Government's RCFC 12(b)(1) challenges to claims in the Second Amended Complaint are addressed below.

## B.    Standing.

Standing is "the threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  The party invoking federal jurisdiction "bears the burden of establishing the[] elements [of standing]."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (same).  To meet this burden at the pleading stage, the complaint must "clearly . . . allege facts demonstrating each element."  *Spokeo*, 136 S. Ct. at 1547 (internal correction and quotation marks omitted); *see also McKinney v. United States Dep't of Treasury*, 799 F.2d 1544, 1557 (Fed. Cir. 1986) ("The facts alleged in the complaint, taken as true for purposes of a standing analysis, must be sufficient to show that a party has suffered, or is likely to suffer, an injury in fact.").

As a matter of law, to establish standing in the United States Court of Federal Claims,[19] a complaint must allege sufficient facts to show that a plaintiff:

> (1) . . . has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000); *see also Figueroa v. United States*, 466 F.3d 1023, 1029 (Fed. Cir. 2006) (same).

In addition, "[t]o have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States." *Anderson*, 344 F.3d at 1351. In other words, the contract at issue must be between the plaintiff and the Government. *See Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990) ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract . . . between the plaintiff and the [G]overnment[.]").

The September 6, 2017 Second Amended Complaint alleges that RMA was in privity of contract with the Government. 2d Am. Compl. ¶ 1 ("On August 1, 2009, the U.S. Army . . . awarded Plaintiff a contract to design and build a new two-story administrative building, warehouse, and sun shade canopies at a [SANG] military base[.]"). In addition, the September 6, 2017 Second Amended Complaint alleges that RMA incurred financial injury that is concrete, particularized, and fairly traceable to the Army's actions. *See generally* 2d Am. Compl. ¶¶ 94–227. And, any financial injury established by RMA can be addressed by a monetary award. 2d Am. Compl. at 29 (Prayer for Relief).

For these reasons, the court has determined that RMA has standing to seek an adjudication of the claims alleged in the September 6, 2017 Second Amended Complaint.

### C.    The Government's November 9, 2017 Motion To Dismiss, Pursuant to RCFC 12(b)(1).

#### 1.    The Government's Argument.

The Government presents three jurisdictional arguments. First, although Counts 1 and 21 of the Second Amended Complaint allege that the Government's termination for default was wrongful and request that the court convert the termination to one for convenience, neither was timely filed in the United States Court of Federal Claims. Gov't Mot. at 35. That is so, because the CO issued a notice of termination for default on August 4, 2010, to inform RMA that the contract "is terminated . . . in accordance with contract clause FAR 52.249-10 . . . [that is] incorporated in full text by contract paragraph 1.49." Gov't Mot. at 35 (citing Gov't App'x 144–

---

[19] The standing requirements of Article III of the United States Constitution also apply to the United States Court of Federal Claims. *See Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (stating that the United States Court of Federal Claims, "though an Article I court, . . . applies the same standing requirements enforced by other federal courts created under Article III") (internal citation omitted).

45). In addition, that notice informed RMA that it "ha[d] the right to appeal under the Disputes [C]lause." Gov't Mot. at 35–36 (citing Gov't App'x 144–45). RMA had twelve months from the date it received the termination notice to file a complaint in the United States Court of Federal Claims, *i.e.*, until August 4, 2011. *See* 41 U.S.C. § 609(a)(3). RMA did not do so until December 15, 2014. Gov't Mot. at 36 (citing Compl. ¶ 20).

Second, the United States Court of Federal Claims does not have jurisdiction to adjudicate Count 2 of the Second Amended Complaint, because RMA never presented a delay claim to the CO. Gov't Mot. at 32. The REAs that RMA submitted on September 4, 2010, July 4, 2011, and January 30, 2012, did not inform the CO that RMA was requesting compensation for not being able to work. Gov't Mot. at 33 (citing Gov't App'x 147–59; *see also Bell BCI Co. v. United States*, 72 Fed. Cl. 164, 168 (Fed. Cl. 2006) ("There is a distinction in the law between: (1) a 'delay' claim; and (2) a 'disruption' or 'cumulative impact' claim. Although the two claim types often arise together in the same project, a 'delay' claim captures the time and cost of *not* being able to work, while a 'disruption' claim captures the cost of working less efficiently than planned." (italics in original)). In particular, the September 4, 2010 REA did not state the length or cost was caused by the Government's delay. Gov't Mot. at 33 (citing Gov't App'x at 148). Nor did the July 4, 2011 REA explain how or why delays occurred, if the Government caused the delays, or if the costs were incurred by those delays. Gov't Mot. at 33 (citing Gov't App'x at 149–52). Likewise, the January 30, 2012 REA failed to describe or explain the delays and did not specify any costs incurred from the delay. Gov't Mot. at 33 (citing Gov't App'x at 155).

Third, the United States Court of Federal Claims does not have jurisdiction to adjudicate Counts 22 and 23, because RMA did not first submit breach of contract and breach of the duty of good faith and fair dealing claims to the CO. Gov't Mot. at 37–38; *see also* 41 U.S.C. § 605(a).

## 2.   RMA Engineering S.A.R.L.'s Response.

The United States Court of Federal Claims has jurisdiction to adjudicate Count 2, because RMA adequately notified the CO of the delays in the REAs and the CO's final decision addressed RMA's delay claims. Pl. Resp. at 34–35 (citing *Rollock Co. v. United States*, 115 Fed. Cl. 317, 327 (Fed. Cl. 2014) ("For the court to exercise jurisdiction over a claim made under the CDA, the contractor must first submit a written claim to the [CO] and the [CO] must issue a final decision on the claim.")). The United States Court of Federal Claims also has jurisdiction to adjudicate Counts 22 and 23, as they recite the same operative facts as RMA's other CDA claims. Pl. Resp. at 35–36 (citing *MW Builders, Inc. v. United States,* 134 Fed. Cl. 469, 492–93 (Fed. Cl. 2017) ("[T]he United States Court of Federal Claims may adjudicate a claim, if it arises from the 'same operative facts' and requests 'essentially the same relief,' as a claim presented to the CO, even if the complaint at issue alleges a 'slightly different legal theory.'" (quoting *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003)))).

Nor are the wrongful termination claims in Counts 1 and 21 of the Second Amended Complaint time-barred. Pl. Resp. at 36–37. The August 4, 2010 Notice Of Termination did not advise RMA of the right to appeal, as required by the CDA. Pl. Resp. at 36. Therefore, the CO's final decision was defective and did not trigger the limitations period. Pl. Resp. at 36–37 (citing *Pathman Constr. Co. v. United States*, 817 F.2d 1573, 1578 (Fed. Cir. 1987) ("A [CO's] final

decision that does not give the contractor adequate notice of its appeal rights is defective and therefore does not trigger the running of the limitations period.")).

### 3. The Government's Reply.

As to Counts 22 and 23, the Government adds that RMA concedes that the REAs did not expressly notify the CO of these claims. Gov't Reply at 26 (citing Pl. Resp. at 35–36). Nor do these claims arise from the same operative facts as those underlying the claims that RMA did present to the CO. Gov't Reply at 26 (citing Pl. Resp. at 35). "A claim arises from the same operative facts as those presented to the [CO] if the [CO] had 'clear notice . . . of the contractor's entire claim,' including the basic theory and allegations supporting the new claim." Gov't Reply at 26–27 (quoting *E&E Enters. Glob., Inc. v. United States*, 120 Fed. Cl. 165, 174 (Fed. Cl. 2015) (citation omitted)). Counts 22 and 23 also do not provide clear and unequivocal notice that the Army hindered, failed to cooperate, or committed subterfuge, evasion, or other acts rising to the level of bad faith. Gov't Reply at 26–27 (citing *Reliance Ins. Co. v. United States*, 931 F.2d 863, 866 (Fed. Cir. 1991) ("No claims that the Government breached the contract or its duty of good faith are properly before the court. [Appellants] only submitted to the [CO] claims for equitable adjustment to the contract. [Appellants] did not submit to the [CO] a clear and unequivocal claim that the VA breached the contract or its duty of good faith.")). *Compare* 2d Am. Compl. ¶¶ 218–27, *with* Gov't App'x at 153–55.

### 4. The Court's Resolution.

#### a. Standard Of Review For A Motion To Dismiss, Pursuant To RCFC 12(b)(1).

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [RCFC] 12(b)(1) motion[.]" *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(1) (allowing a party to assert, by motion, "lack of subject-matter jurisdiction"). When considering whether to dismiss an action for lack of subject matter jurisdiction, the court is "obligated to assume all factual allegations [of the complaint] to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). Nevertheless, the plaintiff bears the burden of establishing jurisdiction by the preponderance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

#### b. RMA Engineering S.A.R.L.'s Claim For Wrongful Termination (Count 1).

On August 4, 2010, the Army terminated the Contract for default. 2d Am. Compl. ¶ 95. The Notice Of Termination states that the CO "determined that [RMA's] failure to perform is not excusable" and "constitutes a decision that [RMA] is in default as specified, and [RMA] has the right to appeal under the Disputes [C]lause." Gov't App'x at 144. The Disputes Clause provides that the Contract is "subject to the Contract Disputes Act of 1978, as amended[.]" Gov't App'x at 80. The CDA states that "[w]ithin ninety days from the date of receipt of a [CO]'s decision under [41 U.S.C. § 605], the contractor may appeal such decision to an agency board of contract appeals[.]" 41 U.S.C. § 606. If a contractor elects to file a suit in the United States Court of

Federal Claims, a complaint must be filed within twelve months from the date of receipt of a CO's decision. *Id.* § 609(a)(3). Failure to file within the prescribed time period is fatal to a contractor's claim. *See Renda Marine, Inc. v. United States*, 509 F.3d 1372, 1380 (Fed. Cir. 2007) ("'Absent commencement of such review within the prescribed period of time, the decision becomes impervious to any substantive review.'" (quoting *United States v. Kasler Elec. Co.*, 123 F.3d 341, 346 (6th Cir. 1997))).

The August 4, 2010 Notice Of Termination is a claim by the Government against RMA under the CDA. *See Malone v. United States*, 849 F.2d 1441, 1443 (Fed. Cir. 1988) ("[A] government decision to terminate a contractor for default is a government claim."). The CDA requires that "[a]ll claims by the [G]overnment against a contractor relating to a contract shall be the subject of a decision by the [CO]." 41 U.S.C. § 605(a). Section 609 of the CDA informs the terminated contractor that it may appeal "the decision of a [CO] under [41 U.S.C. § 605]" in the United States Court of Federal Claims. *Id.* § 609(a)(1). But, this section requires that "[a]ny action under [41 U.S.C. § 609(a)(1)] shall be filed within twelve months from the date of the receipt by the contractor of the decision of the [CO] concerning the claim." *Id.* § 609(a)(3).

RMA argues that 41 U.S.C. § 609(a)(3) was not triggered by the August 4, 2010 Notice Of Termination, but that is not correct, since it was a final decision by the CO. Gov't App'x at 144. RMA cites *Pathman Construction* as support for the proposition that the August 4, 2010 Notice Of Termination was not a final decision, because it did not sufficiently notify RMA of the right of appeal. Pl. Resp at 36–37. It is true that the United States Court Of Appeals for the Federal Circuit has held that when a CO's "final decision . . . does not [afford a] contractor adequate notice of appeal rights," that notice is defective and "does not trigger the running of the limitations period." *Pathman Constr.*, 817 F.2d at 1578. Therefore, in *Pathman*, the plaintiff prevailed, because the Government failed to provide any written notice of termination, much less one apprising the contractor of the right to appeal. *See id.* ("Where a [CO] has not rendered a final decision, the contractor has not been apprised of his appeal rights, as the [CDA] requires."). That is not the situation here, because the August 4, 2010 Notice stated that RMA "ha[d] the right to appeal under the Disputes Clause." Gov't App'x at 144. Nor does RMA's explanation that it is "not familiar with the disputes process generally" (Pl. Resp. at 36–37) excuse RMA from reading the Contract and complying with the Disputes Clause. *See Turner Constr. Co. v. United States*, 367 F.3d 1319, 1321 (Fed. Cir. 2004) ("The parties [to a Government contract] are charged with knowledge of law and fact appropriate to the subject matter, and reasonable professional competence in reading and writing contracts is presumed.").

Because the Notice Of Termination informed RMA of the right to appeal under the CDA, the court next determines whether the twelve-month statutory period began to run from the August 4, 2010 Notice Of Termination or from some later date. That depends on three factual predicates: (1) whether RMA requested the CO to reconsider the termination; (2) whether the CO demonstrated a willingness to reconsider; and (3) if so, when the CO issued a reconsideration decision. *See Guardian Angels Med. Serv. Dogs, Inc. v. United States*, 809 F.3d 1244, 1248–50 (Fed. Cir. 2016) (rejecting an argument that the statutory appeals period ran from the date of the Notice Of Termination, where the CO agreed to obtain and review materials relevant to reconsideration of a decision to terminate a contract for default). Specifically, "[i]n evaluating whether [a Notice Of Termination] qualified as a final [CO] decision sufficient to trigger the

twelve-month statutory appeal period, our focus must be on the [CO]'s actions, not on her own after-the-fact characterization of those actions." *Id.* at 1250.

On September 4, 2010, RMA sent a letter to the CO stating, "[b]y this document, [RMA] requests that the Government change the termination from 'Default' to one of 'Termination for the Convenience of the Government,' and restore [RMA's] rights . . . as provided at paragraph I-49(c) of the [C]ontract; and that [RMA] be reimbursed via an equitable adjustment to the [C]ontract[.]" Gov't App'x at 147. On July 4, 2011, RMA sent another letter to the CO, with an attachment showing different costs than those submitted on September 4, 2010, although RMA did not repeat its prior request to convert the default termination to one for the Government's convenience. *Compare* Gov't App'x at 147–48 (9/4/10 letter requesting the termination for default be converted to one for convenience), *with* Gov't App'x at 149–52 (7/4/11 letter that did not request reconsideration of the termination for default). No subsequent action was taken by the CO, however, that reflected any willingness to reconsider the decision to terminate the Contract for default.

In the alternative, RMA argues that the Army's January 23, 2013 request that RMA submit a SF 1436[20] evidences the CO's willingness to reconsider whether RMA's contract properly was terminated for default. Pl. Resp. at 37. RMA reasons that, because the SF 1436 form is used in negotiated settlements of fixed price contracts that are terminated for convenience, the CO was willing to change the basis for RMA's termination. *See* 48 C.F.R. §§ 49.103 ("Settlement of terminated cost-reimbursement contracts and fixed-price contracts terminated for convenience may be effected by (a) negotiated agreement[.]"), 49.206-2(b) ("When use of the inventory basis is not practicable or will unduly delay settlement, the total-cost basis (SF-1436) may be used[,] if approved in advance by the [termination CO.]"). Count 1, however, does not allege that the CO ever requested a SF 1436. 2d Am. Compl. ¶ 90 ("On January 23, 2013, the *Army recommended* that [RMA] submit Standard Form 1436[.]" (italics added)). In any event, even if the Army did so, it occurred two and a half years after RMA's August 23, 2013 request to reconsider the termination. The United States Court of Appeals for the Federal Circuit has held that "courts have uniformly concluded that administrative agencies possess inherent authority to reconsider their decisions, subject to certain limitations, regardless of whether they possess explicit statutory authority to do so." *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (Fed. Cir. 2008). But, that "inherent authority" exists only "in the absence of a specific statutory limitation," such as that provided by the CDA. *Id.* (quoting in parenthetical *Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002)).

The CDA states that a CO's final decision is "not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced[.]" 41 U.S.C. § 605(b) (2006). Therefore, even if the CO requested a SF 1436 two years after the initial decision, at that time, the CO did not have authority to reconsider RMA's termination. *See Dayley v. United States*, 169 Ct. Cl. 305, 308 (Ct. Cl. 1965) ("[U]nless there is legislation to the contrary[,] it is the inherent right of every tribunal to reconsider its own decisions within a *short period* after the making of the

---

[20] SF 1436 is a standard form used to propose settlement terms for fixed-price contracts terminated for the Government's convenience. *See* 48 C.F.R. § 53.301-1436 (SF 1436 entitled "Settlement Proposal (Total Cost Basis)").

decision and before an appeal has been taken or other rights vested.") (italics added).[21]   In this case, the CO elected not to reconsider the termination of RMA's Contract and RMA did not submit that claim to the court in a timely manner.  *See* 41 U.S.C. § 605(b).

For these reasons, the court has determined that it does not have jurisdiction to adjudicate Count 1 of the Second Amended Complaint.

> ### c.   RMA Engineering S.A.R.L.'s Claims For Delay, Post-Termination Costs, Breach of Contract, And Breach Of The Duty Of Good Faith And Fair Dealing (Counts 2, 21, 22, and 23).

The Government also posits that the United States Court of Federal Claims does not have jurisdiction to adjudicate the delay claims alleged in Count 2, the breach of contract claim alleged in Count 22, and the breach of the duty of good faith and fair dealing claim alleged in Count 23. Gov't Mot. at 32–38.  The court considers each of these arguments in turn.

Under the CDA, a claim for payment must first be presented to the CO for a final decision. *See* 41 U.S.C. § 605(a). A contractor only may file a complaint in the United States Court of Federal Claims, after a final decision is made by the CO.[22]  *See* 41 U.S.C. § 609(a)(1); *see also K-Con Bldg. Sys. Inc. v United States*, 778 F.3d 1000, 1004 (Fed. Cir. 2015) ("Jurisdiction requires both that a claim meeting certain requirements have been submitted to the relevant contacting officer and that the [CO] have issued a final decision on that claim.").  The United States Court of Appeals for the Federal Circuit has interpreted this requirement as authorizing the United States Court of Federal Claims to adjudicate a CDA claim, if it arises from the "same operative facts" and requests "essentially the same relief," as a claim presented to the CO, even if the complaint alleges a "slightly different legal theory" than was presented to the CO.  *See Scott Timber*, 333 F.3d at 1365–66. But, a complaint that alleges a new claim, "either request[s] different remedies," *e.g.*, expectation damages instead of consequential damages "or assert[s] grounds that are materially different from each other factually or legally" first must be submitted to the CO.  *See K-Con Bldg.*, 778 F.3d at 1005; *see also id.* at 1006 ("[M]erely adding factual detail or legal

---

[21] The United States Court of Appeals for the Federal Circuit has held that United States Court of Claims decisions, issued prior to September 30, 1982, are binding precedent. *See S. Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982).

[22] On July 10, 2010, RMA could have filed an appeal in the United States Court of Federal Claims, because RMA's claims statutorily were "deemed" denied, since the CO had not acted on them. *See* 41 U.S.C. § 603(c)(5) ("Any failure by the [CO] to issue a decision on a contract claim within the period required will be deemed to be a decision by the [CO] denying the claim and will authorize [an] appeal or suit on the claim as otherwise provided in this chapter."). RMA's decision not to do so, however, does not render the Second Amended Complaint time barred, since the CO did not issue a final decision until December 15, 2013.  *See* 41 U.S.C. § 609(a)(3) (2006) ("Any action under [41 U.S.C. § 609(a)(1) or 41 U.S.C. § 609(a)(2)] shall be filed within twelve months from the date of the receipt by the contractor of the decision of the [CO] concerning the claim."); *see also Pathman Constr. Co.*, 817 F.2d at 1574 ("[T]he limitations period does not begin to run until the [CO] renders an actual written decision on the contractor's claim[.]").

argumentation does not create a different claim, but presenting a materially different factual or legal theory . . . does create a different claim."). Instead, "[a]ll that is required is that the contractor submit in writing to the [CO] a clear and unequivocal statement that gives the [CO] adequate notice of the basis and amount of that claim." *Contract Cleaning Maint.*, 811 F.2d at 592.

On May 10, 2010, RMA submitted a REA to the CO in the amount of $174,634, for "additional foundation works and relocation of water main not included in the original contract scope for this [P]roject." Gov't App'x at 146. The REA stated, "[i]n view of the substantial documentation, explanations[,] and records indicating the increased quantities of excavations, backfill, reinforced concrete, and water piping works that have been done by RM[A] and accepted on site, we also request a fair and final decision on this subject by the [CO] on our behalf." Gov't App'x at 146. The REA also represented that "supporting documents" were attached "by way of evidence that work executed justifies the calculated amounts." Gov't App'x at 146. Neither the Government nor RMA provided any of these "supporting documents" to the court.

On September 4, 2010, RMA sent a second REA to the CO requesting compensation for "preliminary work" in the amount of $95,802.24. Gov't App'x at 147. That REA stated that "[RMA] has been faced with undisclosed material conditions at the construction site, unknown physical conditions of an unusual nature, numerous changes to the [C]ontract, untoward delays, to include frequent denials of access to the work site, and unlawful acts of non-authorized personnel all of which have inequitably caused [RMA] to suffer additional costs in the amount of . . . [$1,742,571.91]." Gov't App'x at 148. RMA added that it "has substantial material in support of its claim, to include daily logs of work progress and site conditions, correspondence by and between [RMA] and Government officials[,] and records of unlawful actions by unauthorized personnel, all of which shall be made available to the [CO] and government auditors in accordance with applicable regulations at the Government's request." Gov't App'x at 148. No supporting data was attached to the September 4, 2010 REA, but a certification, required by FAR 33.207, was included attesting that:

> I, Jean Yves Rousseau, on behalf of the contractor, RMV Architects, certify that this claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Gov't App'x at 148.

On July 4, 2011, RMA sent a third REA to the CO that stated:

> Further to our letter no. 74 of June 26, 2011, where we indicated that RM[A] was in the process of updating the amount formerly requested and claimed, please find the enclosed RM[A] Statement of Costs. The RM[A] Statement of Costs describes our claim and request for compensation due in excess of USD 2,297,959.

Gov't App'x at 149.

The July 4, 2011 REA also stated, "[w]e also seize this opportunity to request further guidance as to your expected time frame for the resolution of this matter." Gov't App'x at 149. The attached Statement of Costs identified the following items for reimbursement:

- "[P]re-contract design" costs consisting of a "conceptual design phase;"
- "[P]roject construction extra charges" consisting of
  o "Increased Cost – Denials of Access to the Work Site,"
  o "Site Safety Standards Construction,"
  o "Process of Submittal Procedure Approval,"
  o "Site Access[;] ID Procedures System,"
  o "RM[A] Construction Management Services,"
  o "Cost of Site Demarcation,"
  o "Re-design of Foundations & Footing + Waterline Relocation,"
  o "Sunshades (3) Re-design (New Site Location)," and
  o "As-Built Drawings Design;"
- "[C]onstruction additional works" consisting of
  o "Site Generator Power Supply,"
  o "REA #1 (Foundations & Footing),"
  o "Telephone/Data Wiring,"
  o "Main Circuit Breaker at SCECO Inst.,"
  o "Bathrooms Plumbing Modifications,"
  o "Pantry Network [at] First Floor,"
  o "Main Water Supply Modification,"
  o "[AHU] Overcost,"
  o "Lighting Fixture Wiring/EMT," and
  o "Lighting Fixture After Standards Changes;"
- "[P]ost-contract" costs for material and equipment removal from the Project site;
- "[C]ost for managing wrongful termination for default;" and
- "[P]roject critical path."

Gov't App'x at 151–52.

On January 30, 2012, RMA sent a fourth REA to the CO stating that "untoward delays" caused RMA 181 days of delay, at a to-be-determined cost. Gov't App'x at 152 (listing costs for 181 days of delays as "TBD"). The reason cited for the delays was "frequent denials of access to the work site." Gov't App'x at 148. The CO's final decision listed three reasons why RMA's delay claim was denied. Gov't App'x at 168. First, RMA "did not specifically identify[] or provide documentation to support[] any delays of denials of access caused by the Government." Gov't App'x at 168. Second, the "Critical Path Method" that RMA submitted to the CO was "only a copy of daily reports and weekly meeting minutes showing items discussed and actions. The item submitted does not qualify to be a critical path delay analysis and therefore was not analyzed as such." Gov't App'x at 168. Third, RMA "did not provide any specific documentation on how the Government delayed [its] performance." Gov't App'x at 168.

Count 2 alleges "the Project's critical path was delayed a total of 181 days due to the delay events beyond [RMA]'s fault or control." 2d Am. Compl. ¶ 110. Count 2 does not, however, explain how RMA arrived at 181 days, nor which of the delays described in the Second Amended

Complaint at paragraphs 15–16, 18, 21, 24–25, 28–29, 33, 36, 38–40, 44–50, 52–55, and 57–70 are included this Count.  The potential Project site access delays were the only delay claims presented to the CO for a final decision.  2d Am. Compl. ¶¶ 18, 21.  These claims, however, were deficient for other reasons identified by the CO.  Gov't App'x at 168.

For this reason, the court has determined that is does not have jurisdiction to adjudicate the delay claims alleged in Count 2 of the Second Amended Complaint.  *See* RCFC 12(b)(1).

The Government contends that, because the court does not have jurisdiction to adjudicate the wrongful termination claim alleged in Count 1, it also does not have jurisdiction to adjudicate the claims for post-termination costs alleged in Count 21.  Not so.  The court must independently consider whether it has jurisdiction to adjudicate the claims alleged in Count 21.  Count 21 of the Second Amended Complaint alleges that, after contract termination, RMA incurred costs for demobilization, preparation of updated as-built drawings, preparation of the Project's Critical Path Method graph, and "additional management costs that would not have been incurred but for the wrongful termination."  2d Am. Compl. ¶ 217.  The July 4, 2011 REA listed "Post-Contract" costs that included material and equipment removal, *i.e.*, demobilization, "cost of managing wrongful termination for default," and "[P]roject critical path," along with claimed amounts for each.  Gov't App'x at 152.  The July 4, 2011 REA also listed a claimed amount for "as-built drawings design" under "Project Construction Extra Charges."  Gov't App'x at 151.  Therefore, the claims alleged in Count 21 were timely presented to the CO.

Count 22 of the Second Amended Complaint alleges that the Government breached the Contract.  2d Am. Compl. ¶¶ 218–23.  "[A] breach of contract is a failure to perform a contractual duty when it is due."  *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997); *see also Franconia Assocs. v. United States*, 536 U.S. 129, 142–43 (2002) ("Failure by the promisor to perform at the time indicated for performance in the contract establishes an immediate breach."); RESTATEMENT (SECOND) OF CONTRACTS § 235(2) ("When performance of a duty under a contract is due any non-performance is a breach.").  Although the Second Amended Complaint alleges that the collective facts alleged in Counts 1 through 21 are tantamount to a breach of contract, none of the REAs notified the CO that RMA claimed the Army breached the Contract by failing to perform a contractual duty.

Count 23 of the Second Amended Complaint alleges that the Government breached the implied duty of good faith and fair dealing.  2d Am. Compl. ¶¶ 224–27.  In *Reliance Insurance Company*, our appellate court held that the United States Court of Federal Claims did not have jurisdiction to adjudicate a contractor's claim that the Government breached the duty of good faith and fair dealing, when the contractor "only submitted to the [CO] claims for equitable adjustment to the contract."  931 F.2d at 866.  RMA contends that the operative facts of Counts 1 through 21 also support Count 23, *i.e.*, a breach of the duty of good faith and fair dealing.  *See Scott Timber*, 333 F.3d at 1365 (holding that claims are the same for jurisdictional purposes, if they "arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery").

As a matter of law, a contract is a predicate to a claim for the breach of the duty of good faith and fair dealing, but the scope of the duty of good faith and fair dealing does not necessarily require a breach of the underlying contract.  *See Metcalf Constr. Co. v. United States*, 742 F.3d

984, 990–91 (Fed. Cir. 2014) ("What is promised or disclaimed in a contract helps define what constitutes lack of diligence and interference with or failure to cooperate in the other party's performance. . . . In short, while the implied duty exists because it is rarely possible to anticipate in contract language every possible action or omission by a party that undermines the bargain, the nature of that bargain is central to keeping the duty focused on honoring the reasonable expectations created by the . . . contracting parties." (internal quotation marks and citations omitted)).   In this case, the REAs stated only that RMA was claiming additional costs for "undisclosed material conditions at the construction site, unknown physical conditions of [an] unusual nature, numerous changes to the contract, untoward delays[,] to include frequent denials of access to the work site, and unlawful acts of non-authorized personnel all of which have inequitably caused [RMA] to suffer additional costs in the amount of [$1,742,571.91]." Gov't App'x at 148.  The REAs did not inform the CO that the Army interfered with RMA's performance or intended or attempted to destroy RMA's reasonable expectations regarding the fruits of the Contract, *i.e.*, the operative facts of a claim for breach of the duty of good faith and fair dealing. Gov't App'x at 146–59; *see also Metcalf*, 742 F.3d at 991 ("The covenant of good faith and fair dealing imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.") (internal quotation marks, omissions, and italics omitted).  Therefore, the REAs did not inform the CO that RMA was asserting a claim for breach of the duty of good faith and fair dealing.

For these reasons, the court has determined that it does not have jurisdiction to adjudicate the claims alleged in Counts 1, 2, 22, and 23 of the Second Amended Complaint.  Therefore, those claims are dismissed.  *See* RCFC 12(b)(1).  Since RMA provided the CO with the operative facts concerning differing site conditions, the court has determined that it has jurisdiction to adjudicate the claim alleged in Count 21.

### D.     The Government's November 9, 2017 Motion To Dismiss, Pursuant To RCFC 12(b)(6).

#### 1.     The Government's Argument.

The Government next argues that Counts 3 through 20 of the Second Amended Complaint fail to state claims for differing site conditions, constructive change, unjust enrichment, misrepresentation of fact, or breach of implied in fact contract for two principal reasons.  Gov't Mot. at 8–32.  First, RMA agreed to a firm, fixed-price Contract requiring it to "furnish all labor, materials, equipment, supervision[,] and resources required to design and construct New Equipment Training Facilities[,] . . . including associated site work," for the fixed price set in the contract.  Gov't Mot. at 10–11 (citing Gov't App'x at 7, 9).  The United States Court of Appeals for the Federal Circuit has held that "full payment under a valid fixed price-type contract is all to which a contractor is entitled," and the "risk of loss for misjudging what it takes to perform, or for deliberately underbidding, is on the contractor, not the Government."  *AT&T v. United States*, 177 F.3d 1368, 1383–84 (Fed. Cir. 1999).  The Contract provided that "[a]ny failure of [RMA] to take the actions described and acknowledged [in FAR 52.236-3] will not relieve [RMA] from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the Government."  Gov't App'x at 84.  In addition, RMA expressly acknowledged that it had: (1)

"taken steps reasonably necessary to ascertain the nature and location of the work[;]" (2) "investigated and satisfied itself as to the general and local conditions [that] can affect the work or [RMA's] cost[;]" and (3) "satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable[.]"   Gov't App'x at 84 (FAR 52.236-3, Site Investigation and Conditions Affecting the Work).

Second, all of the allegedly additional work either was required as part of the firm, fixed-price contract or was not authorized and thus not compensable.  Gov't Mot. at 13–32.  Neither the Second Amended Complaint nor its prior iterations[23] allege that the CO, *i.e.*, the only person with authority to bind the Government, ordered or approved any additional work or cost beyond the scope of the Contract.  Gov't Mot. at 14.  Therefore, RMA seeks reimbursement, as if the Contract was priced on a time-and-materials basis.  Gov't Mot. at 14.  But, allowing RMA to recover for the failure to exercise due care in submitting an accurate bid would defeat the purpose of firm, fixed-price contracts.  *See AT&T*, 177 F.3d at 1383–84 ("[O]ur precedents are unequivocal that full payment under a valid fixed price-type contract is all to which a contracting party is entitled.  The risk of loss for misjudging what it takes to perform, or for deliberately underbidding, is on the contractor, not the Government.").

Next, the Government discussed the specific deficiencies in Counts 3 through 20 of the Second Amended Complaint.  Count 3 alleges that the quality of the subsurface soils at the Project site concerns a differing site condition, but fails to state a claim on which relief can be granted, because RMA was responsible for taking reasonable steps to "ascertain the nature and location of the [required] work[.]"  Gov't Mot. at 15 (citing Gov't App'x at 84).  The Contract stated that a geotechnical study was necessary to "determine the subsurface conditions at the site."  Gov't Mot. at 15–16 (quoting Gov't App'x at 11–13).  RMA "agreed to perform the geotechnical study and to incorporate the results into [RMA's] foundation design for a firm[, ]fixed[-]price[.]"  Gov't Mot. at 16 (citing Gov't App'x at 7–15).  As a matter of law, however, a contractor cannot seek additional compensation where the contractor's "willingness to hazard the contract was prompted by an unwarranted assumption that it could ask for more money[,] if the geotechnical aspects of the foundation proved to be difficult[,]" or where such assumptions were "compounded by [the contractor's] subsequent reliance on erroneous advice about the difficulty of preparing the foundation, leading it to spend . . . far more than it budged for geotechnical work."  *Liquidating Tr. Ester Du Val of KI Liquidation, Inc. v. United States*, 116 Fed. Cl. 338, 375 (Fed. Cl. 2014).  In addition, any allegations that the SANG made representations to RMA about the Project site's subsurface conditions, prior to contract award, are not relevant, because only the CO could authorize changes to the Contract.  Gov't Mot. at 17 (citing Gov't App'x at 27); *see also Three S Consulting v. United States*, 104 Fed. Cl. 510, 523 (Fed. Cl. 2012), *aff'd*, 562 F. App'x 964 (Fed.

---

[23] The First Amended Complaint alleged that the CO and an individual mistakenly identified as the CO's "replacement" told RMA to follow instructions from the JET, although this allegation was not present in the Second Amended Complaint.  *Compare* 1st Am. Compl. ¶ 12 ("The Army's [CO] for the Project . . . and [her] replacement . . . worsened this ambiguity by telling RM[A] that RM[A] was to take direction from [the] JET[.]"), *with* 2d Am. Compl. (omitting this allegation).

Cir. 2014) ("[O]nly the [CO] has authority to enter into, administer, or terminate contracts and make related determinations and findings." (internal quotation marks omitted)).

Counts 4 through 9 fail to state claims for constructive change for: (1) providing generators; (2) installing telephone and data wiring; (3) installing a main circuit breaker; (4) making changes to toilet plumbing at the behest of the JET; (5) building a pantry instead of a store room; and (6) installing a larger AHU than planned. 2d Am. Compl. ¶¶ 122–55. None of these Counts, however, allege "whether or how many of the materials, finishes, or methods differed from the specifications and drawings attached to the [C]ontract." Gov't Mot. at 29. Neither do they take account of the fact that RMA agreed to perform all necessary work to construct the office building and warehouse for a firm, fixed-price and specifications for that work were included in the Contract. Gov't Mot. at 28–29 (citing Gov't App'x at 7, 121, 123). Nor do they allege that "such changes were ordered or authorized by anyone with authority to bind the United States." Gov't Mot. at 30 (citing *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1344 (Fed. Cir. 2007) ("To demonstrate entitlement to an equitable adjustment, [a plaintiff] must prove that the contract was modified by someone with actual authority. Where a party contracts with the government, apparent authority of the government's agent to modify the contract is not sufficient; an agent must have actual authority to bind the government.")).

Counts 10 and 11 also fail to state claims for constructive change or differing site conditions, because the Contract required RMA to "perform all necessary utility connections as part of the site works line item," including "locating, verifying, relocating, connecting, and repairing water lines[.]" Gov't Mot at 24–25 (citing Gov't App'x at 15, 33, 37, 84, 86, 138–140; *see also Comtrol, Inc. v. United States*, 294 F.3d 1357, 1365 (Fed. Cir. 2002) (affirming dismissal of claim relating to relocation of pipeline, because the drawings put the contractor "on notice that a [] pipeline recently existed and that its relocation was anticipated," and "a reasonable contractor [therefore] would have inquired about the location and condition of the pipeline"). RMA's allegation that the water line was not located where the Army represented does not support Counts 10 and 11, because the Contract required RMA to verify "locations of nearest utility tie-ins . . . *during site visits and preliminary surveys prior to offer*[.]" Gov't App'x at 33 (italics in original). The Contract also provided that RMA warranted that it had taken all necessary steps to "ascertain the nature and location of the work" before the Contract was awarded, including investigating and satisfying itself "as to the general and local conditions which can affect the work or [RMA's] cost," such as "the availability of . . . water, electric power, and roads" and "the conformation and conditions of the ground." Gov't App'x at 84.

Counts 12, 13, and 14 fail to state a claim for constructive change for work that RMA performed when the "Defendant" allegedly caused RMA to: (1) replace and reinstall the conduit and wiring; (2) remove and reinstall light fixtures; and (3) install a different waterproof membrane on the administrative building's roof. 2d Am. Compl. ¶¶ 170–88. As with Counts 4 through 9, these counts fail to allege how the work exceeded the Contract's scope or that the CO authorized any changes that would give rise to a claim for constructive change. Gov't Mot. at 27–30.

Counts 15 and 16 fail to state claims for breach of an implied in fact contract, misrepresentation, or unjust enrichment, because they respectively allege that RMA performed design work prior to contract award for which it was not compensated and "the Government" failed to fulfill a promise to award future contracts in exchange for RMA bidding on the Project. 2d Am.

Compl. ¶¶ 189–203. The Contract, however, required RMA to perform all design work for a firm, fixed-price. Gov't Mot. at 27 (citing Gov't App'x at 7; 48 C.F.R. § 16.202-1). "[O]ral explanations or instructions given before the award of the contract [are not] binding." Gov't Mot. at 27 (quoting *Manuel Bros. v. United States*, 55 Fed. Cl. 8, 37 (Fed. Cl. 2002) (determining that, because oral statements regarding "normal soils" were made at a pre-bid conference but were not incorporated in the contract, a contractor should not have relied on those statements when preparing its bid), *aff'd*, 95 F. App'x 344 (Fed. Cir. 2004); *see also Oppenheim v. United States*, No. 07-852T, 2009 WL 586118, at *7 (Fed. Cl. Mar. 6, 2009) (determining that plaintiffs could not "disavow the terms to which they agreed," namely, that there was to be a fixed schedule of predetermined payments); *S&M Mgmt. Inc. v. United States*, 82 Fed. Cl. 240, 249 (Fed. Cl. 2008) (determining that representatives of the CO did not have authority to orally modify the contract where such authority was expressly disclaimed by the contract terms)).

Count 17 of the Second Amended Complaint also fails to state a claim for constructive change, because it does not describe how the allegedly-changed design submittal and approval process deviated from the Contract's terms. Gov't Mot. at 19. The Contract called for a "three-phase incremental design submittal and approval process for a firm[, ]fixed[-]price[,]" for RMA to submit to the SANG "drawings and designs for each part of the [P]roject . . . for approval prior to construction," and for "incremental submission of design drawings, review and comment by [the] JET, and incorporation of [the] JET's comments into revised final drawings prior to construction." Gov't Mot. at 19 (citing Gov't App'x at 7, 10, 11–12). RMA also was required to maintain "up-to-date as-built drawings on a daily basis" and the CO was to review and approve the "final set of as-built" drawings . . . 'at the time of final inspection of each facility.'" Gov't Mot. at 20 (citing Gov't App'x at 41). The process that the JET requested to be used in November 2009 was identical to that required by the Contract. Gov't Mot. at 20 (citing 2d Am. Compl. ¶¶ 205–07; Gov't App'x at 10–12, 133–41). Moreover, the Contract expressly disavowed any understandings or representations not incorporated into the contract. Gov't App'x at 84.

Likewise, Counts 18 and 19 allege that "unreasonably stringent safety measures" and "increased security measures" were constructive changes to the [C]ontract, but RMA agreed to the "extensive safety, security, and site access measures as part of the [C]ontract, including the measures alleged in these counts." Gov't Mot. at 21. But, the Contract required RMA to: "(1) provide detailed information for each worker's identification pass[;]" (2) "provide updated information at least ten days ahead of time for new workers[;]" (3) "obtain all necessary 'authorizations, permits, and licenses necessary [for] quarry operations, batch plant operations, and haul routes[;]'" (4) provide descriptions and advance notice for "'proper clearance . . . from the Saudi Arabian Government' for all personnel and equipment[;]" and (5) follow and abide by "applicable Saudi Arabian Government laws and regulations[.]" Gov't Mot. at 21–22, (citing Gov't App'x at 33–38). In addition, the Contract's safety clause required RMA to "provide and maintain environments and procedures" that will "safeguard the public and Government personnel, property, materials, supplies, and equipment" throughout the Project site, and to "submit a written proposed plan for implementing this [safety] clause . . . before commencing work[.]" Gov't Mot. at 22 (quoting Gov't App'x at 88). The CO could "notify the contractor . . . and request immediate initiation of corrective action," if the CO learned of any noncompliance with the safety clause. Gov't Mot. at 22 (quoting Gov't App'x at 88). Counts 18 and 19, however, "do[] not claim that the procedures . . . in the [C]ontract were modified in any way." Gov't Mot at 23 (citing 2d Am. Compl. ¶¶ 209–13). To the extent that they allege that the "Army or [the SANG] imposed

procedures above and beyond those specified in the [C]ontract," such conclusory allegations do not explain how the "alleged safety, security, or site access procedures exceeded the requirements in the [C]ontract and regulations[.]"  Gov't Mot. at 23 (citing Compl. ¶ 210; 29 C.F.R. §§ 1926.501–1926.502 (fall protection); 29 C.F.R. § 1926.1052 (stairways); 29 C.F.R. §§ 1926.450–1926.454 (scaffolds));  *see also Brooks v. United States*, No. 14-228C, 2014 WL 4930905, at *2 (dismissing a case for failure to provide sufficient information "necessary for this case to proceed").

Count 20 does not state a claim for constructive change, as it fails to describe any design work that "exceeded the scope of the firm[, ]fixed-price [C]ontract, nor that any changes were ordered or authorized by the [CO]."  Gov't Mot. at 25–26 (citing, *e.g.*, *Brooks*, 2014 WL 4930905, at *2 (dismissing vague and unsupported allegations for failure to state a claim); *Jones*, 122 Fed. Cl. 543, 545–46 (Fed. Cl. 2015) (same)).  RMA agreed to construct a training shelter that would be complete and usable according to previously approved design drawings.  Gov't Mot. at 26 (citing Gov't App'x at 9, 12).  The Contract also required RMA to maintain an adequate inspection system by conducting inspections, maintaining records, and furnishing "all facilities, land, labor, and material reasonably needed for performing [the inspections and tests.]"  Gov't Mot. at 26 (citing Gov't App'x at 18).  In addition, the Contract required RMA to conduct all work under the "'general direction of the [CO] . . . to ensure strict compliance with the terms of the [C]ontract'" and "replace or correct work found by the Government not to conform to [C]ontract requirements" at no increase in contract price unless Government consented to adjusting the contract price.  Gov't Mot. at 26 (italics omitted) (quoting Gov't App'x at 18).

Nor do vague allegations that "the Army," "the Defendant," or "the Government" may have instituted changes plausibly suggest that the CO ordered or authorized them.  Gov't Mot. at 31 (quoting 2d Am. Compl. ¶¶ 4–7, 9, 12, 14).

Finally, Count 21 fails to state a claim for post-termination costs, because RMA had twelve months from the date it received the August 4, 2010 Notice Of Termination to file a complaint in the United States Court of Federal Claims.  *See* 41 U.S.C. § 609(a)(3).[24]  RMA did not do so until December 15, 2014.  Gov't Mot. at 36 (citing Compl. ¶ 20).

## 2.   RMA Engineering S.A.R.L.'s Response.

RMA responds that the Second Amended Complaint sufficiently pled causes of action for compensation for additional work.  Pl. Resp. at 10–31.  Count 3 sets forth "elements necessary to establish a claim for additional costs due to differing site conditions[]:" the subsurface conditions in the contract differed materially from actual conditions; the actual conditions were reasonably unforeseeable based on available pre-award information; RMA reasonably relied on the Contract; and RMA suffered damages as a result of material variation between actual and represented

---

[24] The Government's argument appears to be that, if the court determines that it has jurisdiction to adjudicate Count 21, pursuant to RCFC 12(b)(1), nevertheless, failure to file a complaint within twelve months prohibits the court from granting relief, pursuant to RCFC 12(b)(6).  *See* Gov't Mot. at 36 ("Counts 1 and 21 . . . should therefore be dismissed as untimely pursuant to RCFC 12(b)(1) or RCFC 12(b)(6).").

conditions.  Pl. Resp. at 13 (citing *Comtrol*, 294 F.3d at 1362[25] (listing elements required to state a claim for differing site conditions)).  Count 3 also sufficiently alleges both Type 1 and Type 2 differing site conditions, because the unsuitable soil discovered during a post-award geotechnical investigation was unforeseeable at the time of award and differed materially from the Government's pre-award representations.  Pl. Resp. at 10–12 (citing 2d Am. Compl. ¶¶ 114–15, 117, 121; *see also Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d 1264, 1269[26] (Fed. Cir. 2001) (discussing the difference between Type I and Type II differing site conditions)).  The Government's claim that RMA assumed the risk of all unknown subsurface conditions contradicts the differing site conditions clause.  Pl. Resp. at 11 (citing Pl. App'x at 5).  This is so, because the Contract states that the duty to investigate the site before award extends to the "character, quality, and quantity of surface and subsurface materials or obstacles to be encountered *insofar as this information is reasonably ascertainable from an inspection of the site*[.]"  Pl. Resp. at 11 (italics in original) (quoting Pl. App'x at 81).  The pre-award investigation did not show the information RGF found in the "subsequent soils." 2d Am. Compl. ¶ 115.

Count 4 alleges that RMA incurred additional costs to supply electric generators and states a plausible claim for constructive change.  2d Am. Compl. ¶¶ 123–27.  Although the Government refers to a provision stating that "electrical service is not available for use under this [C]ontract[,]" in fact, the Contract states that the "owner will furnish the necessary electrical power," to allow RMA to perform testing on electrical systems.  Pl. Resp. at 14–15 (bold and italics omitted) (citing Gov't Mot. at 29) (quoting Technical Specification Section 16415, "Electrical Work, Interior," Subsection 3.2).[27]

Count 5 states a claim for constructive change, because the communications provision of the Contract "did not require[] [RMA] to install telephone/data wiring in the administrative building or warehouse[.]"  Pl. Resp. at 15 (citing 2d Am. Compl. ¶¶ 129, 131; Pl. App'x at 127–28).

Count 6 states a claim for constructive change, because the Government "does not state which [C]ontract provision allegedly required [RMA] to install a main circuit breaker."  Pl. Resp. at 16.  Because the "main circuit breaker was required to bring power to the new building," RMA installed the main circuit breaker "[w]ith [the Army's] knowledge" and the CO "knowingly accepted the benefits of the new main circuit breaker;" as such, "[the Army] should . . . compensate [RMA.]"  Pl. Resp. at 16 (citing 2d Am. Compl. ¶¶ 134, 136).

Count 7 states a claim for constructive change arising from changes made to the toilet plumbing.  Pl. Resp. at 17–18 (citing 2d Am. Compl. ¶¶ 139–43).  The Army knew or should have

---

[25] Since RMA did not provide a pinpoint citation, the court has supplied one that appears most relevant.

[26] Since RMA did not provide a pinpoint citation, the court has supplied one that appears most relevant.

[27] Although RMA refers to Technical Specifications associated with the Contract several times, RMA did not provide the court with these Technical Specifications.

known of the plumbing changes and, in any event, accepted the benefits of the additional plumbing work.  Pl. Resp. at 17 (citing 2d Am. Compl. ¶¶ 141–42).  Although the Government references the technical specifications index that included a plumbing section, RMA argues that the technical specification does not justify the inspectors' decision to compel RMA to redo certain toilet plumbing work.  Pl. Resp. at 17.

Counts 8 and 9 also sufficiently state constructive change claims, regarding RMA building a pantry, instead of a store room, and installing a larger 18-ton AHU than initially required.  Pl. Resp. at 18–20.  RMA contends that the CO knew or should have known that this work was requested.  Pl. Resp. at 18–19.[28]  Similarly, the CO also knew or should have known that RMA was "forced to perform" tasks necessary to install the larger AHU, and therefore "cannot stand idly by as a contractor performs additional work[,] accept the benefits of this additional work[,] and . . . [not] pay for it."  Pl. Resp. 19–20.  The Army is liable for this work "by . . . ratification."  Pl. Resp. at 20.

Count 10 states a claim for differing site conditions, because the waterline's location differed from the location shown on the drawing provided by the Army, and "differed materially from conditions ordinarily found to exist."  Pl. Resp. at 20 (citing 2d Am. Compl. ¶¶ 157, 162–63).  RMA argues that the Army was informed of this in an October 3, 2009 letter and the COR agreed that the waterline must be relocated.  Pl. Resp. at 21.  Accordingly, RMA "moved the waterline from the existing location to the location described in the As-Built Drawing SANG 2030-5007."  Pl. Resp. at 21 (citing 2d Am. Compl. ¶ 161).  The Government's argument that RMA assumed the risk that it would have to relocate the waterline does not obviate the differing site conditions Clause.  Pl. Resp. at 21 (citing Gov't Mot. at 25 (citing Pl. App'x at 32, 63–64); *see also Weeks Dredging & Constr. v. United States*, 13 Cl. Ct. 193, 238 (Cl. Ct. 1987) (determining that, although "the case law holds that a contractor need not conduct its own surveys or borings, nor hire its own geologist and geotechnical engineer[,]" a contractor nevertheless is "accountable to discover and pursue reasonable indications . . . which would put a reasonable and prudent contractor . . . on notice that there may be subsurface conditions different than those indicated in the contract[.]"); *Farnsworth & Chambers Co. v. United States*, 171 Ct. Cl. 30, 35 (1965) (holding that a pre-award inspection provision does not "obligate bidders to discover, at their peril, subsurface conditions hidden by the river's water and thus unavailable to any reasonable pre-award inspection")).

Count 11 states a claim for constructive change that should be granted for the same reasons as Count 10.  Pl. Resp. at 20–21.[29]

---

[28]  RMA relies on new factual allegations contained in the proposed Third Amended Complaint to support this proposition; therefore, the court does not address this argument in determining whether the Second Amended Complaint states a claim on which relief can be granted.

[29]  Count 10 alleges that the waterline's location was a differing site condition.  2d Am. Compl. ¶¶ 156–65.  Count 11, however, alleges that connecting the waterline was a constructive change.  2d Am. Compl. ¶ 168 ("This . . . waterline connection work was not factored into [RMA]'s proposal and constituted a constructive, if not actual, change to the contract.").  Differing site conditions and constructive change are different legal claims, therefore, reasons offered to support

Count 12 states a claim for constructive change, because "Defendant . . . directed [RMA] to replace" the installed PVC conduit with metal conduit after RMA installed most of the wiring. Pl. Resp. at 21–22 (citing 2d Am. Compl. ¶ 172). Therefore, the Army knew or should have known that RMA was required to change the electrical conduit and wiring for the light fixtures. Pl. Resp. at 22.

Counts 13 states a claim for constructive change, because the JET verbally approved the light fixture changes during a February 3, 2010 meeting and, on June 28, 2010, "Defendant finally approved light fixtures," thereby effecting a constructive change to the contract. Pl. Resp. at 23 (quoting 2d Am. Compl. ¶ 178).

Count 14 states a claim for constructive change, because the "Defendant requested a double[-]layer EPDM membrane instead of a single layer" on the roof after RMA planned, submitted, and substantially completed the single[-]layer roofing and waterproofing system. Pl. Resp. at 24. RMA argues that "the [CO] or [an] individual acting as the [CO]'s 'eyes and ears' cannot stand idly by as a contractor performs additional work[,] accept the benefits of this additional work[,] and then refuse to pay for it." Pl. Resp. at 24.

Count 15 states a "cognizable claim under the theory of misrepresentation of fact." Pl. Resp. at 25–26 (citing 2d Am. Compl. ¶¶ 190, 192–96, 198). RMA argues that it "provided valuable design services based on Defendant's representations or promise that it would pay for them in a follow-on sole source construction contract[, the Defendant] failed to fulfill this promise and never paid [RMA] for these design services[, and therefore RMA] is entitled to compensation under a misrepresentation theory of relief." Pl. Resp. at 26.

Count 16 also states a claim for misrepresentation, because RMA entered into a contract at a reduced price for design services. Pl. Resp. at 27. "A government contractor . . . may recover damages when the contractor reasonabl[y] relies on incorrect representations made by the Government in entering into a contract." *Manuel Bros.*, 55 Fed. Cl. at 36, *aff'd*, 95 F. App'x 344.

Count 17 states a claim for constructive change, because the Second Amended Complaint alleges the "Defendant" engaged in an unreasonable and burdensome review process. Pl. Resp. at 28. This claim cannot be dismissed under RCFC 12(b)(6), as it "requires a deeper inquiry into the reasonableness of Defendant's review of Plaintiff's submittals." Pl. Resp. at 28.

Count 18 states a claim for constructive change, although it does not cite specific Contract safety provisions, since they are part of the Contract. Pl. Resp. at 28–30 (citing Pl. App'x at 85–86). Therefore, it is premature at this juncture to decide "whether the safety requirements imposed on the Project exceeded what was agreed to between the parties." Pl. Resp. at 29. For purposes of this motion, the United States Court of Federal Claims must assume that RMA's allegations are true and the Government imposed unreasonably stringent safety measures causing RMA to incur additional costs unaccounted for in RMA's proposal. Pl. Resp. at 29. The Government relies on regulations cited in the Contract, but the fact that the safety measures imposed on RMA are

---

why Count 10 states a claim for differing site conditions do not support that Count 11 states a claim for constructive change.

included in Title 29 does not render the Government's decision to impose those requirements automatically reasonable.   Pl. Resp. 29 (citing 29 C.F.R. §§ 1926.450–54, 1926.501(b)(1), 1926.1051;[30] *see also CEMS, Inc. v. United States*, 59 Fed. Cl. 168, 197–98 (Fed. Cl. 2003) ("Although the government may insist upon contractor compliance with the terms of the contract, the government cannot impose a more stringent testing procedure or standard for demonstrating compliance than is set forth in the contract.") (internal quotation marks omitted)).

Count 19 states a claim for constructive change, because the Army "failed to assist in expediting or streamlining security checks for RMA's personnel, suppliers, and subcontractors," and, therefore, violated the Government's duty to cooperate, not hinder a contractor's performance, and Section H.28 of the Contract.  Pl. Resp. at 30 (citing 2d Am. Compl. ¶ 70; Pl. App'x at 38 (requiring RMA and the CO to "develop a mutual understanding relative to the scheduling of the work . . . so that [RMA]'s proposed construction schedule is coordinated with the operating and security requirements of the installation")).   Neither Section H nor any other section of the Contract requires RMA's workers to update their security badges and vehicle identifications every fifteen days.  Pl. Resp. at 30.

Count 20 states a claim for constructive change, although it does not allege why RMA was required to redesign the covered training shelter multiple times.  Pl. Resp. at 30–31.  The only reasonable inference from the fact that RMA is seeking compensation for the multiple redesigns is that the Government acted unreasonably in requiring the multiple redesigns.  Pl. Resp. at 30–31.  Even if the CO did not expressly approve the additional work, Count 20 sets forth a plausible cause of action, based on ratification.  Pl. Resp. at 31–34 (citing *Villars v. United States*, 126 Fed. Cl. 626, 633 (Fed. Cl. 2016) ("Individual ratification occurs when a supervisor: (1) possesses the actual authority to contract; (2) fully knew the material facts surrounding the unauthorized action of his or her subordinate; and (3) knowingly confirmed, adopted, or acquiesced to the unauthorized action of the subordinate. . . . In contrast, institutional ratification occurs when the government 'seeks and receives the benefits from an otherwise unauthorized contract.'" (citations omitted)).

In sum, all of the claims for constructive change allege facts that the court must consider as true, *i.e.*, the CO effectively allowed Saudi Arabian General Saud to administer the Contract through the JET.  Pl. Resp. at 31–32.  Therefore, the CO and the Army knew or should have known that the additional work was performed by RMA and the Army accepted the benefits, rendering the Army liable to RMA under ratification.  Pl. Resp. at 32.

### 3.    The Government's Reply.

The Government adds that, as to RMA's differing site condition claims in Counts 3 and 10, the Differing Site Conditions Clause provides that RMA "cannot seek additional compensation under [the] provision for subsurface conditions which were not 'indicated in the contract[.]'" Gov't Reply at 7–8 (citing Pl. Resp. at 12).[31]  The Contract made no statement about subsurface

---

[30] RMA cites to "29 C.F.R. § 126," that does not exist. The court has replaced that citation with 29 C.F.R. § 1926.450–54, describing regulations related to scaffolding.

[31] In addition, RMA's history of changing allegations provides good reason for the court to doubt that the Army told RMA that subsurface conditions were appropriate for construction.

conditions except that: (1) they were unknown; (2) a geotechnical survey was required; and (3) the original foundation plans may need to be modified. *Compare H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998) ("A contractor cannot be eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be.")), *with* Gov't App'x at 11–13 (the Contract requires RMA to conduct a geotechnical investigation, the purpose of which was to "establish soil bearing capacity")).  Therefore, any assumptions that RMA made about the subsurface conditions were not warranted. *See H.B. Mac*, 153 F.3d at 1347 ("[A] reasonably prudent contractor would have realized the relatively limited scope and utility of the information the government was intending to provide.").

RMA argues that the subsurface conditions were different from what "Defendant" represented, but that is insufficient to support a differing site condition claim.  Gov't Reply at 9 (citing Pl. Resp. at 11; *see also Manuel Bros.*, 55 Fed. Cl. at 36–37, *aff'd*, 95 F. App'x 344 (Fed. Cir. 2004) (holding that a contractor could not rely on oral statements about subsurface conditions allegedly made by CO that were not incorporated into a contract)).  In addition, RMA's Response introduces a new theory that Count 3 is a Type II differing site condition.  Gov't Reply at 12 (citing Pl. Resp. at 11).  Differing site condition claims generally are Type I claims, where subsurface or latent physical conditions are different from those indicated in the contract.  Gov't Reply at 12 (citing *Renda Marine*, 509 F.3d at 1376 ("A Type I differing site condition arises when the conditions encountered differ from what was indicated in the contract documents."); *see also Comtrol*, 294 F.3d at 1362 ("To establish entitlement to an equitable adjustment due to a Type I differing site condition, a contractor must prove, by preponderant evidence, that: the conditions indicated in the contract differ materially from those actually encountered during performance; the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and the contractor was damaged as a result of the material variation between expected and encountered conditions.").

Count 10 (differing site condition) and Count 11 (constructive change) also fail to state claims upon which relief can be granted.  Gov't Reply at 12–13.  Other than alleging that RMA did not know or have a reason to know where the waterline was located, the Second Amended Complaint does not allege beyond "speculation" that the difficulties encountered were extra-contractual.  Gov't Reply at 13 (citing Pl. Resp. at 20).

RMA's constructive change claims in Counts 4 through 9 and 12 through 14 also fail to identify any changes to or deviations from the Contract's requirements and do not allege that the CO ordered or authorized the changes allegedly made to various materials, methods, and finishes. Gov't Reply at 18–22 (citing Gov't App'x at 27).  "Such allegations are insufficient as a matter of

---

*See Bradley v. Chiron Corp.*, 136 F.3d 1317, 1324–25 (Fed. Cir. 1998) (discussing inconsistencies between an original and First Amended Complaint, and discrepancies between First and Second Amended Complaints, and holding that a district court did not abuse its discretion in rejecting the changes "as sham").  The original Complaint, filed December 15, 2014, alleged that a member of the SANG told RMA that subsurface conditions were suitable for construction, but RMA's First Amended Complaint eliminated that allegation.  *Compare* Compl. ¶ 31, *with* 1st Am. Compl. (no allegations that anyone made representations regarding subsurface conditions).

law to support a claim for damages under a firm[, ]fixed-price contract which expressly require[s] authorization [by the CO executing such changes]."  Gov't Reply at 20 (citing Gov't App'x at 27 ("No changes in or deviation from the scope of work shall be effected without a modification executed by the [CO] authorizing such changes. . . . The COR is not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract."); *see also Cath-dr/Balti Joint Venture*, 497 F.3d at 1344 ("To demonstrate entitlement to an equitable adjustment, [a plaintiff] must prove that the contract was modified by someone with actual authority.").  RMA's argument that the CO "ratified" additional work is based on *Villars v. United States*, 126 Fed. Cl. 626 (Fed. Cl. 2016), but reliance on that case is misplaced, as it concerned "whether the government may have ratified an unauthorized contract with plaintiff[,]" not whether alleged changes to the scope of a valid contract may be ratified.  Gov't Reply at 21.

As to RMA's misrepresentation claims in Counts 15 and 16, RMA "expressly agreed" that the Army would not be liable for any "understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this [C]ontract, unless that understanding or representation is expressly stated in [the C]ontract."  Gov't App'x at 84.  A pleading's "factual contentions [must] have evidentiary support or, if specifically so identified, [must be] likely [to] have evidentiary support after a reasonable opportunity for further investigation and discovery[.]"  RCFC 11(b)(3).  RMA expressly agreed in the Contract to perform a geotechnical survey to "establish soil bearing capacity and other soil characteristics" and "verify or modify the foundation design . . . as necessary."  Gov't App'x at 11–15.  Therefore, RMA agreed to perform the geotechnical survey and all necessary work to construct the office building and warehouse for a firm, fixed-price, although the Contract stated that the subsurface conditions were unknown.  Gov't App'x 7–8, 12.  As such, "the risk of loss for misjudging what it takes to perform, or for deliberately underbidding, is on the contractor, not the Government." *AT&T*, 177 F.3d at 1383–84.

Specifically, Count 15 fails to state a claim for misrepresentation, because RMA agreed to perform the pre-award design work for a firm, fixed-price.  Gov't Reply at 17–18 (citing Gov't App'x at 7).  Therefore, "RMA is not entitled to additional compensation beyond the agreed upon amount as a matter of law."  Gov't Reply at 17 (citing Gov't App'x at 7).  Contractors cannot rely on oral promises made pre-award.  *See Manuel Bros.*, 55 Fed. Cl. at 36–37, *aff'd*, 95 F. App'x 344. RMA relies on *Kenney Orthopedic, LLC v. United States*, 103 Fed. Cl. 455, 462–63 (Fed. Cl. 2012) and *Gregory Lumber Co. v. United States*, 9 Cl. Ct. 503, 526 (Cl. Ct. 1986), to support RMA's argument that it may recover for pre-award design work, based on "misrepresentation."  Gov't Reply at 17–18.  Unlike the contracts in those cases, however, the Contract in this case disclaimed liability for pre-award representations.  Gov't Reply at 18 (citing Gov't App'x at 84).  In addition, Count 16 fails to state a claim for constructive change, because it does not plead a claim for cost overruns.  Gov't Reply at 16.  *Manuel Brothers* stands for the proposition that a contractor may recover damages for misrepresentations in the contract.  *See* 55 Fed. Cl. at 36.  Likewise, Count 16 identifies no misrepresentation in the Contract; instead, Count 16 alleges that pre-award statements were made by unnamed Government representatives, including the COR.  Gov't Reply at 16–17.  The Contract, however, prohibits RMA from relying on oral promises.  Gov't Reply at 17 (citing Gov't App'x at 84).

Count 17 fails to state a claim for constructive change, because the "deeper inquiry" RMA seeks is allowed "only when a plaintiff plausibly alleges a valid claim for relief under the applicable law." Gov't Reply 13–14 (citing *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) ("The factual allegations must be enough to raise a right to relief above the speculative level. . . . This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citations omitted))). RMA's allegations are conclusory and insufficient to state a plausible claim, as they do not describe how or why the submittal review process was unreasonable. Gov't Reply at 14 (citing *Jones*, 122 Fed. Cl. at 545–46 (dismissing claim based on "vague assertions against the government . . . devoid of any factual support")).

Counts 18 and 19 fail to state claims for constructive change, because RMA did not identify or describe any changes or deviations from the Contract. Gov't Reply at 14–15. Dismissal is appropriate as Counts 18 and 19 do not state plausible allegations. Gov't Reply at 15 (citing Pl. Resp. at 29). "Plausible" means that the claim includes "factual allegations [sufficient] to raise a right to relief above the speculative level." *Cary*, 552 F.3d at 1376 (citation omitted). RMA does not allege that the Army imposed any safety and security measures beyond what the contract required. Gov't Reply at 15 (italics omitted) (citing Pl. Resp. at 29).

Count 20 fails to state a claim for constructive change, because it fails to allege that RMA's original designs complied with the Contract's requirements. Gov't Reply at 15–16 (citing Pl. Resp. 30–31). The Contract required RMA to construct a training shelter in accordance with the terms and requirements therein. Gov't Reply at 15 (citing Pl. Resp. at 30–31; Gov't App'x at 12, 18). Even if the COR requested that the training shelter be redesigned or the CO approved or ratified such a directive, the court cannot infer from Count 20 that the redesign of the shelter was outside the scope of the Contract's requirements. Gov't Reply at 15–16.

Count 21 fails to state a claim for post-termination costs, because RMA's challenge to the termination was not timely. Gov't Reply at 25.

### 4.      The Court's Resolution

#### a.      Standard Of Review For A Motion To Dismiss, Pursuant To RCFC 12(b)(6).

A challenge to the United States Court of Federal Claims' "[ability] to exercise its general power with regard to the facts peculiar to the specific claim . . . is raised by a [Rule] 12(b)(6) motion[.]" *Palmer*, 168 F.3d at 1313; *see also* RCFC 12(b)(6) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading . . . .   But a party may assert the following defenses by motion: . . . (6) failure to state a claim upon which relief can be granted[.]").

When considering whether to dismiss an action for failure to state a claim, the court must assess whether "a claim has been stated adequately" and whether "it may be supported by [a] showing [of] any set of facts consistent with the allegations in the complaint."   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). The plaintiff's factual allegations also must be substantial enough to raise the right to relief "above the speculative level." *Id.* at 555. In addition,

the court must accept all factual allegations in the complaint as true and make all reasonable inferences in favor of the plaintiff.  *Id.*

The United States Supreme Court also has held that trial courts "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1327 (3d ed. 2018) ("When the plaintiff fails to introduce a pertinent document as part of [the] pleading, a significant number of cases from throughout the federal court system make it clear that the defendant may introduce the document as an exhibit to a motion attacking the sufficiency of the pleading; that certainly will be true if the plaintiff has referred to the item in the complaint and it is central to the affirmative case.").  RCFC 9(k) requires that, "[i]n pleading a claim founded on a contract or treaty, a party must identify the substantive provisions of the contract or treaty on which the party relies.  In lieu of a description, [a] party may annex to the complaint a copy of the contract or treaty, indicating the relevant provisions."  RCFC 9(k).

### b.      Differing Site Conditions (Counts 3 and 10).

FAR 52.236-2 provides that a contractor may recover for differing site conditions under two circumstances: first, if the contractor encounters "[s]ubsurface or latent physical conditions at the site which differ materially from those indicated in th[e] contract;" and second, if there are "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract."  48 C.F.R. § 52.236-2(a).  But, the contractor is required to provide written notice to the CO, who is then required to investigate the conditions and, if they differ from that contemplated by the Contract, provide an equitable adjustment to the contract price.  *See* 48 C.F.R. § 52.236-2(b).

A Type I differing site condition occurs when: (1) a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions; (2) the actual site conditions were not reasonably foreseeable to the contractor, based on information available beyond the contract documents (*i.e.*, that a contractor therefore relied on the representations in the contract); (3) the contractor relied on the contract's representations; and (4) the contractor encountered conditions that differed materially from those represented and incurred damages as a result.  *See Renda Marine*, 509 F.3d at 1376 (stating the elements for Type 1 differing site conditions claim).

A Type II differing site condition occurs when a condition is encountered of a materially different nature from what is "known" and usually encountered in performing the work specified in the contract.  *Id.* at 1376 (citing 48 C.F.R. § 52.236-2); *see also Charles T. Parker Constr. Co. v. United States*, 193 Ct. Cl. 320, 333–34 (Ct. Cl. 1970) ("Under [a Type II differing site condition], the Government has elected not to presurvey and represent the subsurface conditions with the result that a claimant must demonstrate that he has encountered something materially different from the 'known' and the 'usual.'  This is necessarily a stiffer test because of the wide variety of materials ordinarily encountered when excavating in the earth's crust.").  To state a

claim for a "Type II" differing site condition, a complaint must plausibly allege that "the unknown physical condition must be one that could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection of the site, and his general experience[,] if any, as a contractor in the area." *Randa/Madison*, 239 F.3d at 1276 (internal quotation marks omitted). The Site Adapt Design Requirements included in the Contract required that RMA "provide a complete and independent Geotechnical Investigation and Report of the Project to determine the existing subsurface conditions and form the basis for foundation design." Gov't App'x at 127. The Contract makes no affirmative representation regarding the subsurface conditions; instead, it requires RMA to obtain an "independent" Geotechnical Investigation and Report to determine those conditions. Gov't App'x at 12–14.

Count 3 of the Second Amended Complaint alleges that the RGF Geotechnical Investigation Report ("RGF Report") indicated that "subsurface soils contained backfill materials consisting of trash, metal pieces, debris and materials, unprocessed stone fragments in excess of six (6) inches in diameter and unsafe (non-blended) backfilling and material harmful to building structures." 2d Am. Compl. ¶ 115. Therefore, the RGF Report recommended that: (1) these materials be removed and replaced with clean soil; and that (2) the foundation range from 1.5 to 1.8 meters deep. 2d Am. Compl. ¶ 116. Count 3 alleges that this situation was "unforeseeable at the time of contract award[,]" based on "subsurface conditions to be expected based on natural conditions in the area." 2d Am. Compl. ¶ 117. In addition, Count 3 alleges that these conditions "differed materially from Defendant's prior representations that the subsurface conditions were stable and that the foundation would be no more than fifty (50) centimeters deep." 2d Am. Compl. ¶ 117. Count 3, however, does not allege that the Contract represented anything regarding the conditions; instead, it alleges only that "prior representations" were made by the "Defendant." 2d Am. Compl. ¶ 117.[32]   Moreover, the Contract warns that the Army did not "assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract." Gov't App'x at 84.   As a matter of law, a "contractor cannot be eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be." *H.B. Mac*, 153 F.3d at 1345.   Even assuming that a government official represented that the soils were of appropriate bearing capacity, such a statement was not reflected in the Contract so no misrepresentation was made. *See T. Brown Constrs., Inc. v. Pena*, 132 F.3d 724, 728 (Fed. Cir. 1997) ("A contractor can recover damages under a contract for a misrepresentation by the Government in the contract documents.").   Accordingly, Count 3 of the Second Amended Complaint fails to state a claim for a Type I differing site condition.

Count 3 also does not state a claim for a Type II Differing Site Condition.   Although it alleges that the soil contained "debris and manmade materials" and therefore "differed materially from subsurface conditions to be expected based on natural conditions in the area," such

---

[32] As the Government pointed out, the December 15, 2014 Complaint alleged that this representation was made by a specific SANG engineer, *i.e.*, someone who was not a representative of the United States Government. Compl. ¶ 31.

allegations are not sufficient to state that such "natural conditions"[33] are the "usual"[34] conditions in the area.  2d Am. Compl. ¶ 117.   Count 3's allegation that "Defendant" represented the foundation would be no more than 50 centimeters deep also does not establish that a 50-centimeter foundation depth was sufficient to support the Project buildings, given the ordinary conditions in the area.

In contrast, Count 10 of the Second Amended Complaint alleges that, after excavating the Project site, RMA encountered a waterline that "was not located as [the D]efendant had represented," *i.e.*, "as a straight line between two manholes." 2d Am. Compl. ¶ 157.   The actual location allegedly differed from the location "indicated on an as-built drawing provided by Defendant." 2d Am. Compl. ¶ 157.  Count 10 also alleges that, "[b]y letter dated October 3, 2009, [RMA] informed Defendant of the differing site condition[ and t]he [COR] visited the Site and agreed that the waterline had to be relocated." 2d Am. Compl. ¶ 159.  On October 5, 2009, RMA provided "modified designs as proposed solutions[]" that "covered a plan for the new water line and structure foundations." 2d Am. Compl. ¶ 160.   Therefore, unlike Count 3, Count 10 sufficiently states a claim for a Type I differing site condition, because it alleges that: (1) a Contract drawing represented that the waterline was in a specific location; (2) the waterline's actual location was not known until excavation; (3) RMA relied on the location represented in the drawing; and (4) RMA incurred costs to relocate the waterline.

The Government is correct that the Contract required RMA to relocate all utility lines that interfere with foundation work.  Gov't App'x at 37 ("[The c]ontractor is also responsible for rerouting of any utility impacted by the new work.").  The Government is also correct that the Site Investigation and Conditions Affecting the Work Clause provides that RMA "acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered," but the Government failed to account for the remainder of the Differing Site Conditions Clause that provides that such an acknowledgement applies "insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract." Gov't App'x at 84.  In this case, the Contract drawing represented that the waterline was in a different location than that encountered during excavation.  2d Am. Compl. ¶ 157.  The Differing Site Conditions Clause provides for an equitable adjustment in the Contract price, if it was based on the conditions represented in the Contract.  Gov't App'x at 83.  Therefore, Count 10 sufficiently alleges that the conditions encountered materially differed from those represented in the Contract and RMA reasonably relied on the Government-furnished drawing that represented that condition.  *See Renda Marine*, 509 F.3d at 1376.

The Government cites *Comtrol, Inc. v. United States*, 294 F.3d 1357 (Fed. Cir. 2002) for the proposition that, if a contract drawing indicates the presence of underground pipes, a contractor cannot recover on a differing site condition claim.  Gov't Mot. at 25.  *Comtrol*, however, concerned a contract drawing that "indicated the proposed location for [a utility corridor] as running beneath

---

[33]   "Natural" is defined as "existing in or caused by nature; not made or caused by humankind." *Natural*, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010).

[34]   "Usual" is defined as "habitually or typically occurring or done; customary." *Usual*, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010).

a portion of the site that was later proposed as the location of [a] tower [to be constructed]." *Comtrol*, 294 F.3d at 1365. The drawing depicted a pipeline, but stated that it was to be relocated to the utility corridor "by others." *Id.* The drawing did not specify when the pipeline would be relocated. *Id.* Based on those facts, the United States Court of Appeals for the Federal Circuit held that the drawing was patently ambiguous as to the pipeline's location, placing the contractor "on notice that a fuel pipeline might exist at or near the construction site, and . . . had a duty to seek clarification of this ambiguity." *Id.* In this case, however, Count 10 does not allege that the drawing was ambiguous, but that the drawing represented the waterline was in a specific location that differed from what was encountered during excavation. Therefore, *Comtrol* is not relevant to whether the waterline in this case was a differing site condition.

For these reasons, the court has determined that Count 3 does not allege sufficient facts to state a claim for either a Type I or Type II differing site condition and is dismissed; however, Count 10 alleges sufficient facts to state a claim for a Type I differing site condition. *See* RCFC 12(b)(6).

### c.        Constructive Changes (Counts 4–9, 11–14, and 17–20).

Counts 4 through 9, 11 through 14, and 17 through 20 appear to allege claims for constructive change. To state a claim for constructive change, a complaint must plausibly allege facts sufficient to show: (1) that the contractor "performed work beyond the contract requirements;" and (2) that the "additional work was ordered, expressly or impliedly, by the government." *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014); *see also Info. Sys. & Networks, Corp. v. United States*, 81 Fed. Cl. 740, 746 (Fed. Cl. 2008) ("A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government.").

As to the first element, the work must exceed the scope of work specified in the contract; in contrast, where the Government insists on performance in compliance with the contract specifications, no adjustment in the contract price is warranted. *See Flink/Vulcan v. United States,* 63 Fed. Cl. 292, 309 (2004), *aff'd,* 163 F. App'x 890 (Fed. Cir. 2006) (no constructive change when contractor could have declined extra work or proceeded under protest, but elected to proceed without reservation, for business reasons). In addition, where the contract requires the contractor to provide notice to the CO of changes that the contractor believes are constructive changes, notice must be timely. *See K-Con Bldg.*, 778 F.3d at 1010 ("[T]he notice provision serves an important purpose in a contract in which *some* government requests are plainly contemplated *under* the contract. Timely written notice differentiates requests the contractor views as outside the contract from those it deems contemplated by the contract." (italics in original)).

As to the second element, an informal order or other conduct requiring the contractor to exceed the scope of the contract must originate from an individual with authority to bind the Government. *See Cath-dr/Balti Joint Venture*, 497 F.3d at 1344 ("Where a party contracts with the government, apparent authority of the government's agent to modify the contract is not sufficient; an agent must have actual authority to bind the government."). Actual authority is implied when such authority is an "integral part of the duties assigned" to the particular government agent. *See H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) (internal quotation marks and citation omitted). No implied authority exists, however, if an action taken by a government agent contravenes the explicit terms of a contract. *See Cath–dr/Balti Joint*

*Venture*, 497 F.3d at 1346 (holding that a government agent did not have implied authority to modify a contract, where that contract "explicitly state[d] that only the [CO] had the authority to modify the contract").  Where an unauthorized government official directs a contractor to perform additional or different work, however, a CO may ratify the unauthorized work, provided that the CO has knowledge of the underlying material facts and approves the work.  *See United States v. Beebe*, 180 U.S. 343, 354 (1901) ("Where an agent has acted without authority and it is claimed that the principal has thereafter ratified his act, such ratification can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken."); *see also Cath-dr/Balti Joint Venture*, 497 F.3d at 1347 (requiring actual authority and "knowledge of material facts involving the unauthorized act").

In this case, the Contract provided that "[a]ll contract administration will be effected by the [CO.] . . . No changes in or deviation from the scope of work shall be effected without a modification executed by the [CO] authorizing such changes."  Gov't App'x at 27.  As to changes for which the contractor believes it is entitled to an adjustment in price, the Contract required RMA to provide a written notice to the CO within 30 days of receipt of a written change order or 20 days from the date the Army effected the change.  Gov't App'x at 93.  In addition, the Contract provided that, if a COR were to be appointed, such appointment would be done "in writing by the [CO]" and would "specify the extent of the COR's authority to act on behalf of the [CO,]" but expressly stated that the "COR is not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract."  Gov't App'x at 27. With respect to SANG officials, the Contract provided that "[a]ll communication by the Contractor with all officials, representatives, and/or offices of the Saudi Arabian Government in all matters pertaining to the design or construction of [the C]ontract, shall be through and in full liaison with the [CO,]" but that requirement "does not relinquish [RMA's] responsibility for obtaining routine items to conduct day-to-day business, such as visas, permits, and custom clearances."  Gov't App'x at 37.  In short, the CO was the only individual with actual authority to bind the Army and order changes to the Contract's scope of work.

Although Counts 4 through 9, 11 through 14, and 17 through 20 allege that RMA incurred costs for constructive changes, none specify that the CO directed any additional work.  Instead, each of the Counts alleges only that the "Army" or the "JET" or "Defendant" could request that RMA perform certain work.   2d Am. Compl. ¶ 1 (stating that in the Second Amended Complaint, "Defendant" refers to the "U.S. Army, Government Joint Engineering Team").  Moreover, none of these Counts allege that the CO actually authorized any changes *post hoc*.  In addition, none of these Counts allege sufficient facts to reflect the CO's knowledge of any change.  Instead, these Counts are conclusory allegations stating, *e.g.*, that "Defendant knew, or should have known" about the work, or "Defendant accepted the benefits" without compensating RMA.  The United States Supreme Court has held that such allegations fail to state a claim on which the court may grant relief.  *See Twombly*, 550 U.S. at 549 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal alterations omitted)).  Nor do these Counts allege that RMA provided any notice to the CO prior to performing any allegedly additional work, although the Contract required that RMA provide such notice.  Gov't App'x at 93 (providing that an equitable adjustment to the contract price can be made for additional work ordered by the CO, "[p]rovided, that the [c]ontractor gives the [CO] written notice stating . . . [t]he date, circumstances, and source of the order; and . . . [t]hat the [c]ontractor regards the order as a change order."); *see*

*also Calfon Constr., Inc. v. United States*, 18 Cl. Ct. 426, 439 (Cl. Ct. 1989), *aff'd*, 923 F.2d 872 (Fed. Cir. 1990) ("Contractors are duty bound to inform the [CO] if official direction will result in claims against the Government.").

Specifically, Count 4 also alleges that RMA "reasonably assumed that there was adequate electrical power on site . . . based on representations made by [the] Defendant[,]" but was later "informed that . . . electrical power . . . would not be available until late in the [P]roject and that [RMA] would have to supply electrical generators." 2d Am. Compl. ¶¶ 123–24. In addition, Count 4 alleges that the "supply of generators was not part of the [C]ontract's scope of work and represented a constructive, if not express, change to the [C]ontract." 2d Am. Compl. ¶ 126. Section H-14 of the Contract, however, expressly provides that "[e]lectrical service is not available for use under [the C]ontract, therefore all electric current required by the [c]ontractor shall be the responsibility of the [c]ontractor, furnished at its own expense." Gov't App'x at 36. In addition, Section I.27 of the Contract provides that the "[c]ontractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to . . . the availability of . . . electric power[.]" Gov't App'x at 84. Although RMA implies that "prior representations" were made by an unspecified individual, the Contract provides that the Army does not "assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of [the C]ontract, unless that understanding or representation is expressly stated in [the C]ontract." Gov't App'x at 84. In addition, the Contract is an integrated agreement, with respect to conditions affecting the scope of work, so parol evidence would be allowed only to supplement an agreement "by consistent additional terms." *McAbee Constr. Inc. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996). No such understanding or representation was alleged in this case.

Count 5 alleges that the Contract did not require RMA to install telephone or data wiring in the administrative building or warehouse. 2d Am. Compl. ¶ 129. Even if Count 5 alleged that the CO directed the work, it still would not state a claim for constructive change, because the scope of work included these items. RMA was required to construct the administrative building and warehouse in accordance with approved drawings. Gov't App'x at 15 (stating that the contractor "shall construct the facilities in accordance with the technical specifications, contract drawings, approved site-adapt drawings, and contract requirements"). The Contract also required drawings to "include the identification of and connection to existing infrastructure and utilities required to make the new and supporting facilities functional. The infrastructure and utilities of concern include . . . [the] communications network[.]" Gov't App'x at 13. The Contract defined "utility systems" as "all exterior utilities, such as water, sewer, drainage, electricity, telephone, and other similar systems." Gov't App'x at 13. In addition, the Contract stated, that RMA "shall include in the design of the office building a communication system that includes both telephone and data service to each work space." Gov't App'x at 15. Therefore, the Contract required RMA to provide telephone and data systems and Count 5 does not identify any additional work that RMA was required to perform with respect to such systems.

Count 6 alleges that RMA "installed a main circuit breaker at [a] transformer on site[,]" with "Defendant's knowledge," but that work was not required by the Contract nor part of RMA's "original cost proposal." 2d Am. Compl. ¶ 134. The Contract defined "utility systems," "as all

exterior utilities, such as water, sewer, drainage, electricity, telephone, and other similar systems." Gov't App'x at 13.   Likewise, the Contract required RMA to "indicate in design drawing submittals the method of connecting all facilities to electrical power[,]" and provided that electrical power must "connect to the nearest SEC facility in a manner proposed by the contractor and approved by the JET."  Gov't App'x at 15.  In addition, Section H.16 of the Contract stated that RMA was "responsible for tie-in of all required utilities and paying of all connection and testing fees" that may be required by SEC and other government agencies.  Gov't App'x at 37.  Count 6, however, does not allege any facts that plausibly state how installing a circuit breaker to connect the constructed facilities to electrical power exceeded the scope of the Contract.

Count 7 alleges that "[i]nspectors acting on behalf of the Defendant[] each had their own perception of how the toilet plumbing should be constructed and demanded that the work [be] performed their way[,]" requiring RMA to comply with "at least five . . . changes to the toilet[] plumbing."  2d Am. Compl. ¶ 139.   As such, RMA was "forced to make changes to the toilet plumbing at the behest of [the] JET, [that] included performing rework at significant cost to [RMA]."  2d Am. Compl. ¶ 140.  Count 7 alleges this work was performed "at the behest of [the] JET," "acting on behalf of the Defendant," and also "General Saud['s] . . . engineers [i.e., SANG personnel]."  2d Am. Compl. ¶ 139.  Even assuming that the individuals ordering that work were JET personnel, Count 7 does not allege that RMA's original work was in compliance with the Contract, thereby rendering the rework outside the scope of the Contract.  It is true that the JET was designated with "cognizance over all technical aspects of the contract and [responsibility] for monitoring [c]ontractor performance."  Gov't App'x at 27.  But, the JET had no authority to change the scope of the Contract or price.  *See NavCom Def. Elecs., Inc. v. England*, 53 F. App'x 897, 900 (Fed. Cir. 2002) (explaining that a constructive change can occur where an informal order is made by an authorized Government agent, or by Government fault, but requiring strict compliance with the contract specifications and correction of nonconforming work does not amount to constructive change) (citation omitted).

Count 8 alleges that, on October 10, 2009, the JET requested that RMA "redesign[] the first floor of the administration building to build a pantry instead of a store room[,]" and that this change required RMA to install "a sink along with plumbing for water supply and drainage."  2d Am. Compl. ¶ 146.  Count 8 alleges that this work constituted a "constructive, if not actual, change to the contract."  2d Am. Compl. ¶ 147.  The Contract provided that the administration building would be an original design by RMA, although a sample floorplan was included.  Gov't App'x at 10.  The Contract also required design submission and revision after technical comments were received from the JET.  Gov't App'x at 7, 11 (discussing three design submissions and at least two rounds of receiving and incorporating comments and changes).  Count 8, however, contains no factual allegations explaining how replacing a pantry with a storeroom exceeded the scope of the Contract or was inconsistent with the requirements therein.  The Contract states that RMA was required to design an office building and incorporate comments by the JET on the design.  Gov't App'x at 7, 9–11.

Count 9 alleges that RMA "originally planned on installing a 15-ton [AHU], which Defendant had approved[,]" but that unit was "not readily available . . . and would take six weeks to deliver to the site[,]" so the Army "therefore asked" RMA to install an 18-ton unit that was available locally.  2d Am. Compl. ¶¶ 151–52.  Consequently, RMA "had to perform new engineering calculations for system, electrical, roof supports, piping, ductwork[,] and other items."

2d Am. Compl. ¶ 152.  The Contract, however, required that any change in the size of the AHU needed to be approved by the CO.  Gov't App'x at 27; *see also Cath-dr/Balti Joint Venture,* 497 F.3d at 1346 (holding that where a contract and governing regulations are "clear" that "the [CO] was the only person with authority to make changes to the contract," changes allegedly directed by other personnel are not binding on the Government).  Count 9 does not allege that the installation of the 18-ton AHU was directed by the CO, the only individual with authority to make such a change.

Count 11 alleges that RMA "expended significant funds to connect [the] waterline to the building[,] pursuant to [the] JET['s] requirements[,]" but that work "was not factored into SMN's proposal and constituted a constructive, if not actual, change to the contract."[35]  2d Am. Compl. ¶¶ 167–68.  The Contract, however, provided that the "contractor is responsible for tie-in of all required utilities and paying of all connection and testing fees[,]" and that the "contractor is also responsible for rerouting of any utility impacted by the new work."  Gov't App'x at 37.  In short, the Contract required RMA to perform the work that Count 11 alleges was beyond the scope of the Contract.

Count 12 alleges that, during construction, the Army "changed the electrical wiring [required] for light fixtures[,] . . . after [RMA] had already installed most of the wiring."  2d Am. Compl. ¶ 171.  In addition, the Army "directed [RMA] to replace all PVC conduit . . . with EMT conduit (metal cladding)."  2d Am. Compl. ¶ 172.  Further, the Army "knew, or should have known, that [RMA] was directed to change the electrical conduit and wiring for the light fixtures[, such that the] work constituted a constructive, if not express, change to the contract."  2d Am. Compl. ¶ 174.  The Contract, however, provided that the "contractor is responsible for tie-in of all required utilities and paying of all connection and testing fees[,]" and that the "contractor is also responsible for rerouting of any utility impacted by the new work."  Gov't App'x at 37.

Count 13 alleges that the "JET verbally approved the light fixtures shown in a supplier catalog," but during a site visit after the fixtures were installed, "a JET inspector rejected the light fixtures and restarted the light fixture approval process."  2d Am. Compl. ¶¶ 177–78.  After additional meetings with the JET and the lighting supplier, the Army "finally approved [the] light fixtures[,]" and RMA replaced the rejected fixtures with the newly approved fixtures.  2d Am. Compl. ¶¶ 178–79.  As previously discussed, the JET had "cognizance over all technical aspects of the contract and [responsibility] for monitoring [c]ontractor performance."  Gov't App'x at 27.  In addition, the JET's input was an integral part of the design approval process as reflected in the Contract.  Gov't App'x at 7, 11 (discussing three design submissions and at least two rounds of receiving and incorporating comments and changes).  Count 13, however, does not allege that the initial verbal approval of the light fixtures from a supplier catalog was a part of this design approval process.  2d Am. Compl. ¶ 178.  Even assuming this work was within the scope of the work to be performed, Count 13 does not allege that the installation of the light fixtures complied with the approved design.  Therefore, the JET could insist on performance in strict compliance with the contract specifications, without adjusting the contract price.  *See NavCom Def. Elecs., Inc.*, 53 F. App'x at 900 ("The government generally has the right to insist on performance in strict

---

[35] It is not clear who or what "SMN" is.  The court assumes the reference to SMN is a clerical error and that Count 11 intended to refer to RMA's proposal.

compliance with the contract specifications and may require a contractor to correct nonconforming work." (citation omitted)).  Moreover, no factual allegations state whether the work performed was in conformity with the Contract or the changes requested were for rework or additional work.

Count 14 alleges that RMA "originally planned on installing a waterproof roof system consisting of a single layer EPDM rubber membrane[,]" but "[a]fter the site work was substantially complete[d], [the] Defendant requested a double layer EPDM membrane instead of a single layer." 2d Am. Compl. ¶¶ 183–85.  Count 14 does not allege what the Contract required nor does it allege any facts to plausibly establish that a double layer membrane exceeded the contract requirements; it only alleges what RMA initially planned to do.

Count 17 alleges that at a pre-construction meeting the parties agreed that two Government employees would be responsible for approving submittals, but that the JET requested a "major change" by requiring all submittals to be approved by JET engineers.  2d Am. Compl. ¶¶ 205–06; *see also* 2d Am. Compl. ¶ 207 ("As a result of this change, [RMA] submitted over 200 submittals for Defendant's formal review and incurred additional costs totaling $71,545.").  The Contract, however, provides that the S-1, S-2, and S-3 design submittals were to be made to the JET, for review and approval.  Gov't App'x at 7, 11.  Each of these submittals was to include "AutoCAD design drawings," "Existing Site Layouts," "Proposed Site Layouts," and technical reports prepared, pursuant to the Contract.  Gov't App'x at 11.  Count 17, however, does not allege how, if at all, the "changed" process differs from that required by the Contract.

Count 18 alleges that the "JET engineers imposed unreasonably stringent safety measures, including safety handrails, temporary stairs[,] and wood platforms[ that] hindered [RMA's] performance and caused it to incur additional costs . . . of $30,360.00[,]" including overhead and profit.  2d Am. Compl. ¶¶ 210–11.  The Contract states that RMA was required to "comply with the standards issued by the Secretary of Labor at [29 C.F.R. Part 1926 and 29 C.F.R. Part 1920]" and implement any "additional [safety] measures the [CO] determines to be reasonably necessary[.]"  Gov't App'x at 88.  The regulations cited in the Contract concern the use of a guardrail system, temporary stairs, and platforms.  *See* 29 C.F.R. §§ 1920.1–1926.1442.  For example, construction employees must be protected by a guardrail system.  *See* 29 C.F.R. § 1926.501(b)(1) ("Each employee on a walking/working surface . . . with an unprotected side or edge which is 6 feet . . . or more above a lower level shall be protected from falling by the use of guardrail systems, safety net systems, or personal fall arrest systems.").  Other safety provisions concern temporary stairways.  *See* 29 C.F.R. §§ 1926.1052(a)(1) ("Stairways that will not be a permanent part of the structure on which construction work is being performed shall have landings of not less than 30 inches[.]"), 1926.1052(b)(3) ("Treads for temporary service shall be made of wood or other solid material, and shall be installed the full width and depth of the stair.").  Safety regulations require the use of platforms.  *See* 29 C.F.R. § 1926.1052(a)(4) ("Where doors or gates open directly on a stairway, a platform shall be provided[.]"), 29 C.F.R. § 1926.801(c) ("Whenever a shaft is used, it shall be provided, where space permits, with a safe, proper, and suitable staircase for its entire length, including landing platforms, not more than 20 feet apart.  Where this is impracticable, suitable ladders shall be installed with landing platforms located about 20 feet apart to break the climb.").  Although 29 C.F.R. Part 1926 allows for variances from the safety standards, under certain circumstances, employers must apply for a variance from the Assistant Secretary of Labor for Occupational Safety and Health.  *See* 29 C.F.R. § 1926.2(a); *see also* 29 C.F.R. § 1905.1.

48

Count 18 alleges that the use of "safety handrails, temporary stairs, and wood platforms" was "unreasonably stringent," and RMA incurred substantial costs as a result. 2d Am. Compl. ¶ 68. These safety measures, however, were required by Department of Labor regulations and RMA also was required to comply with any "additional [safety] measures the [CO] determine[d] to be reasonably necessary[.]" Gov't App'x at 88. Therefore, Count 18 does not plausibly allege that compliance with safety requirements exceeded the Contract's scope of work nor allege facts to support why the use of safety rails, stairways, and platforms was unreasonable.

Count 19 alleges that RMA incurred additional expenses for "obtaining security badges, vehicle identifications, and updates to [the] same every fifteen days." 2d Am. Compl. ¶ 213. The Contract provided that "[t]he [c]ontractor shall provide within five (5) calendar days after contract award, a complete list of personnel who are to work on the [P]roject[]" and "be ready as directed by SANG security to present original passport and igama for verification." Gov't App'x at 33–34. In addition, "[e]ach request for personnel pass . . . [must] include worker's name, nationality, copy of passport and igama [sic], and . . . photographs[.]" Gov't App'x at 33. The Contract also required RMA to coordinate passes "at least ten (10) calendar days prior to required access" and obtain all necessary "authorizations, permits, and licenses necessary [for] quarry operations, batch plant operations, and haul routes." Gov't App'x at 33–35. In addition, RMA was required to comply with Saudi Arabia Laws and Customs and advise "the [COR] of the names of personnel, type, and amounts of equipment, dates and length of time required at the site, and purpose of entering Saudi Arabia . . . [for] proper clearance . . . from the Saudi Arabian Government." Gov't App'x at 38. RMA "agree[d] that it and all of its personnel who [] perform work under this contract within Saudi Arabia . . . are subject to all applicable Saudi Arabian Government laws and regulations." Gov't App'x at 38. The Contract's Safety Clause also required RMA to "provide and maintain . . . environments and procedures" that will "safeguard the public and Government personnel, property, materials, supplies, and equipment" throughout the Project site, and to "[s]ubmit a written proposed plan for implementing this [Safety C]lause" before commencing work. Gov't App'x at 88. The CO, however, was authorized to "notify the contractor . . . and request immediate initiation of corrective action," if he became aware of noncompliance with the Safety Clause. Gov't App'x at 88. The Contract, however, prohibited RMA from obtaining an "equitable adjustment of the contract price or extension of the performance schedule on any stop work order issued under [the Safety C]lause." Gov't App'x at 88. Therefore, Count 19 does not allege sufficient facts to support that obtaining "security badges, vehicle identifications, and updates to [the] same every fifteen days[]" was outside of the scope of the Contract nor that other safety requirements were unreasonable; nevertheless RMA seeks reimbursement for the costs incurred for compliance. 2d Am. Compl. ¶ 213.

Count 20 alleges that RMA "redesigned the Covered Training Shelter portion of the Project multiple times," and incurred additional costs as a result. 2d Am. Compl. ¶ 215. The Contract, however, provided that the Covered Training Shelter would be a "site adapted design," based on drawing SANG 020, such that RMA was required to "modify the . . . drawing[] to fit the specified site." Gov't App'x at 9–10. The Contract also stated that the design submission and revision would be based on technical comments received from the JET. Gov't App'x at 7, 11 (discussing three design submissions and at least two rounds of receiving and incorporating comments and changes). Count 20, however, does not explain how any redesigns exceeded the scope of the work set forth in the Contract; instead, it alleges only that RMA redesigned the Covered Training Shelter "multiple times." 2d Am. Compl. ¶ 215.

For these reasons, the court has determined that Counts 4 through 9, 11 through 14, and 17 through 20 fail to state claims for constructive change and are dismissed.  *See* RCFC 12(b)(6).

### d.       Misrepresentation Or Unjust Enrichment (Counts 15 and 16).

Count 15 of the Second Amended Complaint alleges that prior to award, the Army requested that RMA "design a building for the [SANG] for administrative and training purposes." 2d Am. Compl. ¶ 190.  Count 15 also alleges that RMA completed several designs between December 2008 and February 2009, and at a meeting on or about April 7, 2009, the Army "promised [RMA] that it would be compensated for this pre-award design as part of [a] sole source contract for construction of the building[]" and that "Defendant's representations induced [RMA] to enter into the contract."  2d Am. Compl. ¶¶ 190–95.  Count 15 further alleges that RMA was not compensated for "pre-award design efforts" so the "Defendant . . . is liable . . . in the amount of $95,800 under the parties' agreement, or alternatively, under the theory of unjust enrichment or misrepresentations of fact."  2d Am. Compl. ¶ 198.

Count 16 of the Second Amended Complaint alleges that when RMA agreed to the terms of the Contract, "representatives of the Defendant, including the [COR], represented to [RMA] that it would receive other contracts."  2d Am. Compl. ¶ 200.  These representations allegedly "induce[d RMA] to provide design services at arbitrary pricing dictated by the Defendant in the total amount of $94,000 for 35%, 90% and 100% design submissions."  2d Am. Compl. ¶ 200. Count 16, however, alleges that RMA did not receive other contract awards.  2d Am. Compl. ¶ 201.  On that basis, Count 16 requests that RMA be reimbursed for "cost overrun in design services for the contract design work totaling $118,910.00, which includes overhead and profit."  2d Am. Compl. ¶ 203.

Counts 15 and 16 do not allege that any individual with authority to bind the Government agreed to award any other contracts to RMA.  In fact, the Contract expressly states that the COR has no authority to bind the Army.  Gov't App'x at 27 (the COR was not "authorized to make any commitments or changes that [would] affect price, quality, quantity, delivery, or any other term or condition of the contract.").  The Contract also provided that all design work would be performed for the firm, fixed-price of 352,500 Saudi Riyals. Gov't App'x at 7 (subtotal for CLINs 0001 through 0003).  A firm, fixed-price contract is one that "is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract."  48 C.F.R. § 16.202-1.  For this reason, the United States Court of Appeals for the Federal Circuit has held that "full payment under a valid fixed price-type contract is all to which a contracting party is entitled," and the "risk of loss for misjudging what it takes to perform, or for deliberately underbidding, is on the contractor, not the Government."  *AT&T*, 177 F.3d at 1383–84.  Moreover, "oral explanations or instructions given before the award of a contract [are not] binding" and contractors "cannot rely on . . . statements [that] were never incorporated into the contract."  *Manuel Bros.*, 55 Fed. Cl. at 37, *aff'd*, 95 F. App'x 344.  Assuming that the COR promised RMA that it would receive any future contract award, any such statement is not enforceable, because the COR could not promise to award future contracts in contravention of the competition requirements in the FAR.  *See* 48 C.F.R. § 6.101(b) ("[CO]s shall provide for full and open competition through use of the competitive procedures contained in this subpart that are best suited to the circumstances of the contract action and consistent with the need to fulfill the Government's requirements efficiently[.]").

For these reasons, the court has determined that Counts 15 and 16 do not allege sufficient facts to state a claim for misrepresentation or unjust enrichment and are dismissed.  *See* RCFC 12(b)(6).

### e. Post-Termination Costs (Count 21).

Count 21 of the Second Amended Complaint alleges that, following contract termination, RMA incurred costs for demobilization, preparation of updated as-built drawings, preparation of the Project's Critical Path Method graph, and "additional management costs that would not have been incurred but for the wrongful termination." 2d Am. Compl. ¶ 217.  The court has determined that it does not have jurisdiction to adjudicate the wrongful termination claim alleged in Count 1 of the Second Amended Complaint and therefore cannot convert the termination for default into one for convenience.  For this reason, a default termination precludes a contractor's recovery for post termination costs, absent extraordinary circumstances.  *See Mega Constr. Co. v. United States*, 29 Fed. Cl. 396, 437 (Fed. Cl. 1993) ("[O]nce plaintiff's contract was terminated for default, its only responsibility, as it was instructed, was to vacate the job-site immediately.  The default termination can be analogized to the final payment to a contractor in that it marks the end of the contract. . . . However, post-termination for default costs are not recoverable in the absence of extraordinary circumstances . . . or judicial conversion of the default termination to a termination for the convenience of the [G]overnment[.]" (citations omitted)).  Count 21, however, does not allege any extraordinary circumstances that would entitle RMA to state a claim for post-termination costs.

For these reasons, the court has determined that Count 21 does not allege sufficient facts to state a claim for post-termination costs and is dismissed.  *See* RCFC 12(b)(6).

### E. RMA Engineering S.A.R.L.'s March 22, 2018 Cross-Motion For Leave To File A Third Amended Complaint.

#### 1. RMA Engineering S.A.R.L.'s Argument.

Pursuant to RCFC 15(a), "a party may amend the party's pleading only by leave of court or by written consent of the adverse party." RCFC 15(a). RMA argues that, if the court determines that any of the Counts in the Second Amended Complaint fails to state a claim, RMA requests leave to file a Third Amended Complaint to provide additional facts, grounds for relief, and supporting exhibits.  Pl. Resp. at 37–38.  RMA represents that the proposed Third Amended Complaint includes "much more particularized claims than the original Complaint" that "better describe[] who provided direction for change order work and plead[ing] facts sufficient to show that the [CO] approved these changes either expressly or by ratification." Pl. Resp. at 38.

#### 2. The Government's Response.

The Government responds that the court should deny RMA's Request To File Another Amended Complaint. Gov't Reply at 2–7.  Leave to amend pleadings typically should be granted freely "when justice so requires." RCFC 15(a)(2).  But, the court also must consider the possibility of prejudice to the adverse party and the passage of time so as to "not impose endlessly upon the defendant and the court 'by the presentation of theories seriatim.'"  Gov't Reply at 3 (citing *Cencast Servs., L.P. v. United States*, 729 F.3d 1352, 1363 (Fed. Cir. 2013)). "If [an] issue lurks

in the case, vacillation can cause the other party irreparable injury." Gov't Reply at 5 (quoting *Tenneco Resins Inc. v. Reeves Bros.*, 752 F.2d 630, 634 (Fed. Cir. 1985)). "Delay alone, even without a demonstration of prejudice, has [] been sufficient grounds to deny amendment of pleadings." *Cencast*, 729 F.3d at 1364; *see also Bradley*, 136 F.3d at 1325[36] (holding that the trial court was not required to accept as true amended allegations that were "self-serving" and inconsistent with prior factual allegations). RMA's proposed Third Amended Complaint is "both unduly delayed and prejudicial to the Government." Gov't Reply at 3. RMA requests to amend for the third time "more than three years after this lawsuit was filed, almost two years after RMA's [F]irst [A]mended [C]omplaint was filed, and more than [fifteen] months after the Government completed written discovery." Gov't Reply at 5.

In addition, the Government filed an Answer to the original Complaint, served extensive discovery requests, and agreed to allow RMA to depose Jean Yves Rousseau, in Saudi Arabia, and spent substantial time researching and preparing diplomatic documents for permission to conduct that deposition. Gov't Reply at 4. Although the United States Embassy issued necessary papers in September 2016 for that deposition, RMA failed to respond to the Government's discovery requests that were more than three months overdue at the time. Gov't Reply at 4. More than two years ago, the diplomatic note requesting permission to conduct the deposition was prepared and likely will need to be reissued; in addition, at least two key witnesses for the Government, the CO and the technical representative, have retired from federal service. Gov't Reply at 6; *see also Tenneco Resins*, 752 F.2d at 634 ("[A]fter several opportunities foregone by [plaintiff], [the Government's] burden of demonstrating prejudice is light.").

Another Complaint also will allow Plaintiff "to introduce [a new] theory [that] would . . . prejudice[] the [G]overnment, which had already devoted significant resources to litigating the issues long recognized as raised by the case." Gov't Reply at 6 (quoting *Cencast*, 729 F.3d at 1364 (internal corrections omitted)). The Second Amended Complaint failed to allege that the "additional" work was not required by the Contract or authorized by the CO. Gov't Reply 5. The Third Amended Complaint does not cure these deficiencies, and therefore would be futile. *See* Gov't Reply at 5. In addition, the Third Amended Complaint greatly expands the theories of relief, but Plaintiff fails to explain why such theories were not addressed in any of the prior complaints. Gov't Reply at 5–6.

### 3.     RMA Engineering S.A.R.L.'s Reply.

RMA replies that the Third Amended Complaint will not prejudice the Government, because: (1) the Government did not allege that the Second Amended Complaint would create prejudice, and nothing has changed; (2) RMA has not delayed adjudication of the case since the Second Amended Complaint was filed; and (3) the Third Amended Complaint contains no new claims. Pl. Reply at 6. In addition, the Government's resources have not been wasted, because the Third Amended Complaint arises from the same facts as the original Complaint, and depositions have not been completed. Pl. Reply at 7. In addition, the fact that some witnesses have retired does not affect either party's ability to call them to testify at trial. Pl. Reply at 7. The

---

[36] The Government did not provide a pinpoint citation; the court has done so.

Government has proffered no evidence that fading memories and lost documents will prejudice the Government.

The Third Amended Complaint also will not be futile, because it contains additional information in support of prior allegations. Pl. Reply at 8. Nor will it alter the theories of relief presented in the Second Amended Complaint, but elaborates on the claims. Pl. Reply at 8–9. In addition, the Government's attack on the credibility of allegations regarding the relocation and connection of a new water line (Counts 10 and 11) and design submittal and approval (Count 17) is premature, because credibility is an issue for the court to consider at trial. Pl. Reply at 10. In addition, the Third Amended Complaint contains more detailed allegations about: "unreasonable" safety and security measures (Counts 18 and 19); design services for the covered training shelter rendered beyond the scope of the contract (Count 20); pre-award design work (Count 15); cost overrun for the base contract design (Count 16); and RMA's claims for payment for additional work. Pl. Reply at 11–13.

### 4.   The Court's Resolution.

#### a.   Governing Precedent.

RCFC 15(a)(2) provides that a party may amend pleadings with the court's leave, and leave should be freely given "when justice so requires." RCFC 15(a)(2). This Rule is applied liberally, because "the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48 (1957). Nevertheless, the court should not grant leave when an amended pleading would unfairly prejudice the opposing party, impose undue delay, be futile, or is made in bad faith. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Because RCFC 15 is "designed to facilitate the amendment of pleadings[,] except where prejudice to the opposing party would result," prejudice is a critical factor in determining whether to grant leave to amend. *United States v. Hougham*, 364 U.S. 310, 316 (1960); *see also Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1320 (Fed. Cir. 2010) ("Prejudice is the 'touchstone of the inquiry under rule 15(a).'" (citation omitted)). Prejudice has been found where an amendment results in unfair surprise, a broadening or fundamental change in the issues litigated, or prompting further discovery or a need for significant new preparation. *See Cencast*, 729 F.3d at 1363–64. In addition, "[a] litigant's failure to assert a claim as soon as he could have is properly a factor to be considered in deciding whether to grant leave to amend." *Tenneco Resins*, 752 F.2d at 634 (internal quotation marks and citation omitted). Therefore, the United States Court of Appeals for the Federal Circuit has held that "[d]elay alone, even without a demonstration of prejudice, [is] sufficient grounds to deny amendment of pleadings." *Te-Moak Bands of W. Shoshone Indians of Nev. v. United States*, 948 F.2d 1258, 1262 (Fed. Cir. 1991).

Futility is also a sufficient ground to deny a motion to amend. *See Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1333 (Fed. Cir. 2000). An amendment is futile when the proponent cannot provide a colorable argument that the original or the amended claim will not survive a dispositive motion. *Id.* When the non-moving party argues that the amendments are futile, the moving party must provide sufficient facts to demonstrate that the amended pleading can survive a dispositive pretrial motion. *See Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1355 (Fed. Cir. 2006) ("When a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that [the

complaint] states a claim on which relief [can] be granted, and it must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion.").

### b. Whether The Third Amended Complaint Is Unduly Delayed Or Prejudicial To The Government.

Prejudice has been found where an amendment results in unfair surprise, a broadening or fundamental change in the issues litigated, or the prompting of further discovery or a need for significant new preparation. *See Cencast*, 729 F.3d at 1363. In addition to prejudice, if an "issue lurks in the case, vacillation can cause the other party irreparable injury." *Tenneco Resins*, 752 F.2d at 634 (internal corrections omitted).

The original Complaint in this case that was filed on December 15, 2014 alleged two claims: (1) breach of contract, due to wrongful termination; and (2) breach of the duty of good faith and fair dealing. Thereafter, the Government filed an Answer and the parties proceeded with discovery. On February 18, 2016, RMA requested leave to amend the December 15, 2014 Complaint and filed a First Amended Complaint that did not claim a breach of the duty of good faith and fair dealing. *Compare* Compl. ¶¶ 48–55, *with* 1st Am. Compl. ¶¶ 1–42 (alleging no claim for a breach of the duty of good faith and fair dealing).

On January 11, 2017, RMA's first counsel sought leave to withdraw as counsel; thereafter, RMA retained a second counsel, but did not seek leave to file a Second Amended Complaint for several months. When the Second Amended Complaint was filed on September 6, 2017, twenty-two new counts were added. *See generally* 2d Am. Compl. The Government did not oppose the Second Amended Complaint, but reserved the right to file a motion to dismiss. ECF No. 34 at 1 ("Counsel for [the Government] does not oppose this motion with reservation of rights to file a motion to dismiss, if appropriate.").

RMA now seeks the opportunity to add "more detail" to cure deficiencies in the Second Amended Complaint. As the Government points out, "RMA does not explain why its new allegations were not asserted when the lawsuit was first filed, or when RMA first amended its complaint, or after the Government responded to RMA's written discovery requests." Gov't Reply at 5. It is true that depositions of RMA's principal and the Government employees who were involved in the award and administration of the Contract have not taken place, but this appears to be a situation of RMA's making, since RMA elected not to comply with written discovery requests from the Government that were required prior to conducting the deposition. Gov't Reply at 4–5. Although "RMA finally responded to the Government's written discovery requests on December 31, 2016, more than eight months after [they] were served, . . . RMA's responses were facially deficient." Gov't Reply at 4–5. Therefore, allowing a Third Amended Complaint to be filed would require additional discovery and another round of motions under RCFC 12(b). This situation strikes the court as analogous to one where the United States Court of Appeals for the Federal Circuit observed: "[W]ith the passage of time and acceptance of multiple earlier amendments, a point is reached when the party seeking to amend must justify that request by more than invocation of the concept of the rule's liberality." *Te-Moak Bands of W. Shoshone Indians of Nev.*, 948 F.2d at 1263.

For these reasons, the court has determined that, based on this record, RMA's Motion For Leave To File A Third Amended Complaint should be denied, as it would prejudice the Government.

### c.     Whether The Third Amended Complaint Is Futile.

The court has determined that it does not have jurisdiction to adjudicate the claims alleged in Counts 1, 2, 22, and 23 of the Second Amended Complaint, because they were not presented to the CO in a timely manner, but the court has determined that it has jurisdiction to adjudicate the allegations in Count 10 regarding RMA's claim for a Type I differing site condition. Therefore, the court considers here whether the remaining claims alleged in the proposed Third Amended Complaint, would survive a RCFC 12(b)(6) Motion.

### i.     Differing Site Conditions (Counts 3 and 10).

The only new allegations in the Third Amended Complaint are found in Paragraph 146, that recites some of the elements for a Type II differing site condition claim. *Compare* 2d Am. Compl. ¶¶ 117, 120, *with* 3d Am. Compl. ¶¶ 138–48. These allegations, however, are conclusory and do not remedy the deficiencies previously identified in Count 3 of the Second Amended Complaint. Likewise, Count 10 of the Third Amended Complaint adds no new information, but instead repeats or reformats the allegations in the Second Amended Complaint that the court has determined plausibly alleges a Type I differing site condition claim.

### ii.    Constructive Change (Counts 4–9, 11–14, and 17–20).

Count 4 of the Third Amended Complaint concerns the availability of electrical power during construction and adds only that the Contract represented that electrical power would be available, because it stated that the "contractor shall furnish all instruments and personnel required for the tests and Owner will furnish the necessary electrical power." 3d Am. Compl. ¶ 151 (underline omitted). As with the Second Amended Complaint, these allegations conflate electrical power used for testing electrical systems post-installation with electrical power used for construction, that the Contract expressly stated was not available. Gov't App'x at 36 ("Electrical service is not available for use under this contract, therefore all electrical current required by the [c]ontractor shall be the responsibility of the [c]ontractor, furnished at its own expense."). In addition, the Contract disclaimed pre-award representations, unless any such representations were incorporated therein. Gov't App'x at 84 ("The Government assumes no responsibility for any conclusions or interpretations made by the [c]ontractor based on the information made available by the Government. Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract."). Therefore, Count 4 alleges no new facts that state a claim for constructive change.

Count 5 of the Third Amended Complaint concerns whether telephone and data wiring were required by the Contract and adds that the COR made a pre-award representation that the wiring would be installed by a "special JET installation communication team." 3d Am. Compl. ¶¶ 159–60. As the court previously determined, however, the Contract expressly required RMA to

install telephone and data wiring.  Gov't App'x at 10, 13, 130–31.  Therefore, Count 5 alleges no new facts that state a claim for constructive change.

Count 6 of the Third Amended Complaint is largely the same as that alleged in the Second Amended Complaint, but adds that RMA notified the CO, by a June 2, 2010 letter, of the "need to install a main circuit breaker was not part of the [C]ontract." 3d Am. Compl. ¶ 169.  On June 19, 2010, the CO responded that the main circuit breaker installation was required under the Contract.  Pl. App'x Ex. 29.  The Contract required RMA to propose the method of connection for, and to connect, all utilities required to render the buildings operational.  Gov't App'x at 15, 33, 37.  Therefore, Count 6 alleges no new facts that state a claim for constructive change.

Count 7 of the Third Amended Complaint alleges that several changes were made to the toilet plumbing that amounted to a constructive change.  3d Am. Compl. ¶ 176.  Toilet plumbing work was completed between January 24, 2010 and March 3, 2010.  3d Am. Compl. ¶ 44.  RMA, however, did not provide notice to the CO that it considered this work to be additional until May 31, 2010, *i.e.*, nearly three months after it was completed.  3d Am. Compl. ¶ 177.  That notice, however, did not comply with the notice requirements set forth in the Contract.  Gov't App'x at 93 (FAR 52.243-4 Changes Clause requiring *post hoc* notice within 20 days of a change).  Therefore, Count 7 alleges no new facts that state a claim for constructive change.

Count 8 of the Third Amended Complaint alleges that, on October 10, 2009, a JET engineer requested that RMA redesign the first floor of the administrative building to include a pantry, instead of a store room, and this resulted in additional construction costs to install a sink and plumbing.  3d Am. Compl. ¶¶ 184, 188.  Count 8 alleges that RMA notified the CO of this change during a meeting held on December 21, 2009, and again in a letter dated May 31, 2010.  3d Am. Compl. ¶ 185.  Count 8, however, states that RMA provided the CO with verbal notice more than two months after the work was requested and did not provide the written notice required under the Changes Clause until seven and a half months after the work was requested.  3d Am. Compl. ¶¶ 184–85.  These allegations do not state a claim that the requested design change qualified as "additional" work, because the office building was to be an original design by RMA that incorporated the JET's changes to the design at periodic intervals.  Gov't App'x at 7, 9, 11.  Therefore, Count 8 alleges no new facts that state a claim for constructive change.

Count 9 of the Third Amended Complaint alleges that: (1) RMA was requested to provide an 18-ton AHU during a meeting on February 2, 2010 (3d Am. Compl. ¶ 191); (2) the CO "was well aware of this acceleration plan and approved it" (3d Am. Compl. ¶ 191); (3) the work was performed from March 2–7, 2010 (3d Am. Compl. ¶ 192); and (4) the required notice was provided on May 31, 2010 (3d Am. Compl. ¶ 193).  Count 9 does not allege facts that state the CO was aware of the larger AHU and approved it.  In addition, RMA's notice to the CO that it proceeded under protest was not provided until nearly three months after work was complete.  Gov't App'x at 93 (FAR 52.243-4 Changes Clause requiring RMA to provide a written notice to the CO within 30 days of receipt of a written change order or 20 days from the date the Government effected the change).  *Cf. Calfon Constr. Inc.*, 18 Cl. Ct. at 439 ("If the contracting officials have knowledge of the facts or problems that form the basis of a claim and are able to perform necessary fact-finding and decisionmaking, the Government is not prejudiced by the contractor's failure to submit a precise claim at the time a constructive change occurs. . . . On other facts[, however,] lack of immediate notice seriously can prejudice government interests.  Where contractor silence would

foreclose less costly alternative solutions or the ability of the Government to avoid contractor claims, timely notice is required."). Therefore, Count 9 alleges no new facts that state a claim for constructive change.

Count 11 of the Third Amended Complaint alleges that the Contract was constructively changed when RMA was required to install a 2.5-inch waterline, after it installed a 2-inch waterline. 3d Am. Compl. ¶¶ 65–66, 208.  Count 11 also alleges that RMA "advised [the] JET in several meetings that it was useless or an economic waste to change the waterline" but "Defendant" nevertheless "insisted that the waterline be changed to 2.5 inches." 3d Am. Compl. ¶ 67.  Count 11, however, does not allege sufficient facts to support that this work exceeded that required by the Contract; only that this work "was not factored into [RMA's] proposal." 3d Am. Compl. ¶ 209.  Nor does Count 11 allege that the work was required by an individual with authority to bind the Government in contract or any facts that would support the conclusory allegation that the CO ratified any alleged change.  Therefore, Count 11 alleges no new facts that state a claim for constructive change.

Count 12 of the Third Amended Complaint alleges that, after RMA installed most of the electrical wiring, a JET inspector "changed the electrical wiring for light fixtures" and directed RMA to "replace all PVC conduit . . . with EMT conduit (metal cladding)." 3d Am. Compl. ¶¶ 214–15.  Count 12 adds the name of the "JET OPM Representative" who directed the work and alleges that this additional work was done from March 28, 2010 to April 24, 2010. 3d Am. Compl. ¶¶ 47, 216.  In addition, Count 12 adds that on February 22, 2010, RMA provided notice to the COR that it performed the required electrical work. 3d Am. Compl. ¶¶ 49, 217.  But, written notice to the CO was sent in a letter dated May 31, 2010, *i.e.*, five weeks after the work was completed.  3d Am. Compl. ¶ 217.  No factual allegations support that the JET OPM Representative had actual authority to bind the Government or that the CO ratified any allegedly additional work.  Therefore, Count 12 alleges no new facts that state a claim for constructive change.

Count 13 of the Third Amended Complaint alleges that a JET inspector also approved light fixtures in February of 2010, that were delivered from April 1 to 3, 2010, but a JET inspector subsequently disapproved of the light fixtures and required RMA to order new ones.  3d Am. Compl. ¶¶ 222–24.  RMA informed the CO of this change on May 31, 2010, and from June to July replaced the light fixtures.  3d Am. Compl. ¶¶ 223–24.  These allegations imply that RMA proceeded to replace the light fixtures, but under protest.  Count 13, however, does not allege that the CO approved or disapproved of this work or whether the original light fixtures complied with the specifications provided in the Contract.[37]  Therefore, Count 13 alleges no new facts that state a claim for constructive change.

Count 14 of the Third Amended Complaint alleges that RMA submitted a single-layer roofing system to "Defendant" on January 20, 2010, but that after Project site work was substantially completed, the "JET/General Saud[]" directed RMA to install a double-layer roofing system and RMA completed this work from April 3 to 8, 2010. 3d Am. Compl. ¶¶ 230–32.  Again,

---

[37] Neither RMA nor the Government provided a copy of the technical specifications listed in Section J of the Contract.

no allegations represent that General Saud had actual authority to bind the Government in contract or that the work was "additional." Nor does Count 14 provide any factual allegations to support the conclusory allegations that the CO "knew, or should have known, that [the] JET/General Saud directed [RMA] to install a double layer EPDM roof," "knew, or should have known, that this additional work was being performed[,]" and "approved or ratified the directive[.]" 3d Am. Compl. ¶¶ 232–34. Therefore, Count 14 alleges no new facts that state a claim for constructive change.

Count 17 of the Third Amended Complaint alleges that the design approval process used during contract performance required RMA to submit "over 200 submittals for Defendant's formal review," and thereby exceeded the scope of the Contract. 3d Am. Compl. ¶¶ 255, 257. Therefore, Count 17 alleges no new facts that state a claim for constructive change.

Count 18 of the Third Amended Complaint alleges that RMA was subjected to increased, "unreasonably stringent safety measures[.]" 3d Am. Compl. ¶ 262. Count 18 adds that RMA provided notice to the CO regarding about its concern on December 21, 2009. 3d Am. Compl. ¶ 263. Count 18, however, does not explain how safety measures required by the Contract amounted to additional work. Therefore, Count 18 alleges no new facts that state a claim for constructive change.

Count 19 of the Third Amended Complaint alleges that RMA was subjected to increased security measures, in part, because the CO and COR "failed to . . . assist in expediting or streamlining security checks for [RMA's] personnel, suppliers, and subcontractors" and RMA had to pay costs for "obtaining security badges, vehicle identifications, and updates to same every fifteen days." 3d Am. Compl. ¶¶ 268, 270. The Contract required RMA to provide all information required to secure Project site access for contractor and subcontractor personnel. Gov't App'x at 37 (providing that RMA had "responsibility for obtaining routine items to conduct day-to-day business, such as visas, permits, and custom clearances"), 38 ("The [c]ontractor shall be responsible for advising the [COR] of the names of personnel, type, and amounts of equipment, date and length of time required at the site, and purpose of entering Saudi Arabia, so that proper clearances may be obtained from the Saudi Arabian Government."). Therefore, Count 19 alleges no new facts that state a claim for constructive change.

Count 20 of the Third Amended Complaint alleges that RMA incurred additional costs for redesigning the Covered Training Shelter "multiple times." 3d Am. Compl. ¶ 275. The Third Amended Complaint alleges that this "went beyond the design services required for the Covered Training Shelter under . . . the Contract[,]" but provides no information to support this conclusory allegation. 3d Am. Compl. ¶ 275. Although RMA notified the CO of this work on June 2, 2010 (3d Am. Compl. ¶ 277), no new factual allegations support that this notice was timely since the initial contract completion date was February 6, 2010. Therefore, Count 20 alleges no new facts that state a claim for constructive change.

### iii. Uncompensated Pre-Award Design Work (Counts 15–16).

Count 15 of the Third Amended Complaint includes two new, but inconsistent allegations: first, that the CO, together with the COR, promised RMA that it would be compensated for design

work; and second, that the CO "knew or should have known that the [COR] had promised to compensate [RMA] for pre-award design services."   3d Am. Compl. ¶¶ 238, 245.   These allegations, however, do not overcome the fact that RMA agreed to a firm, fixed-price for all design services for the buildings required by the Contract.   *See AT&T*, 177 F.3d at 1383 ("[F]ull payment under a valid fixed price-type contract is all to which a contractor is entitled."). Therefore, Count 16 alleges no facts that state a claim for constructive change, unjust enrichment, or misrepresentation of fact.

Count 16 of the Third Amended Complaint alleges breach of an implied-in-fact contract and unjust enrichment to support imposing liability on the Government for the failure to award additional contracts. 3d Am. Compl. ¶¶ 248, 250–52. To state a claim for implied-in-fact contract, RMA must allege sufficient facts to establish:  "(1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) 'actual authority' on the part of the [G]overnment's representative to bind the [G]overnment in contract."   *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003).  In other words, the "requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs."  *Id.*  In addition, as with the Second Amended Complaint, the Third Amended Complaint fails to allege that the CO made any promise or representation regarding additional contracts.   3d Am. Compl. ¶ 248 ("[R]epresentatives of the Defendant, including the [COR] . . . and . . . OPM Chief [of] Technical Affairs, represented to [RMA] that it would receive other contracts.").   Therefore, Count 16 alleges no facts that state a claim for breach of an implied-in-fact contract or unjust enrichment.

For the foregoing reasons, the court denies RMA's March 22, 2018 Cross-Motion to file a Third Amended Complaint as it would be futile.  *See* RCFC 15(a)(2).

## IV.   CONCLUSION.

The Government's November 22, 2017 Motion To Dismiss is granted as to Counts 1 through 9 and 11 through 23 of the Second Amended Complaint, but denied as to Count 10. RMA's March 22, 2018 Cross-Motion For Leave To Amend is denied.  The court will convene a telephone status conference in early September 2018 to discuss further proceedings.

**IT IS SO ORDERED.**

s/ Susan G. Braden   
**SUSAN G. BRADEN**
**Senior Judge**